BURR ROAD OPERATING COMPANY II, LLC *v.* NEW ENGLAND HEALTH CARE EMPLOYEES UNION, DISTRICT 1199
(AC 33954)

DiPentima, C. J., and Bear and Borden, Js.

---

Argued October 18, 2012—officially released April 30, 2013

*Andrea C. Kramer*, for the appellant (plaintiff).

*Michael E. Passero*, for the appellee (defendant).

*Opinion*

BORDEN, J. The dispositive issue of this appeal is whether the award of the arbitrator reinstating the grievant, Leoni Spence, who is an employee of the plaintiff, Burr Road Operating Company II, LLC, operating

as Westport Health Care Center, and a member of the defendant, New England Health Care Employees Union, District 1199, violates public policy and, therefore, must be vacated. We conclude that the award does violate public policy and, accordingly, we reverse the determination of the trial court to the contrary.

The plaintiff terminated the employment of the grievant. The defendant took the termination to arbitration. The arbitrator found that there was just cause only to suspend the grievant for one month, not to discharge her. Accordingly, the arbitrator ordered that she be reinstated with back pay and lost benefits, less the one month period during which she was suspended from work, and that she be issued a final warning. The plaintiff filed with the trial court an application to vacate the award, and the defendant filed a cross application to confirm the award. The court denied the application to vacate the award, granted the cross application to confirm the award and rendered judgment accordingly. This appeal by the plaintiff followed.

The plaintiff claims that the court improperly denied the application to vacate and granted the cross application to confirm for two reasons: (1) the award violates public policy, and (2) the arbitrator exceeded his authority. We agree with the plaintiff's first claim. Therefore, it is not necessary to reach its second claim.

The arbitrator was asked to answer two questions on the basis of the collective bargaining agreement between the plaintiff and the defendant: "Was [the grievant's employment] terminated for just cause? If not, what shall the remedy be?" After a hearing, the arbitrator found the following facts.

The plaintiff is a 120 bed, skilled nursing facility located in Westport. The grievant was employed there

as a certified nursing assistant from 2002 until the termination of her employment in 2010, and is represented by the defendant.

The events leading to the termination of the grievant's employment occurred between March 20 and 24, 2010. Prior to that time, the grievant had received a number of disciplinary actions that remained as part of her personnel file. In 2005, her employment was terminated after she improperly restrained a resident by using a bedsheet to tie him into his wheelchair. That termination was reduced to a suspension and final warning by agreement between the plaintiff and the defendant. Because that disciplinary action resulted from an incident of patient abuse, that suspension and final warning properly was retained in the grievant's personnel file indefinitely.[1] In April, 2009, the grievant received a written warning for speaking in an inappropriately rude, loud and scolding manner to a resident, and for being insubordinate and disrespectful to her shift supervisor. That written warning was challenged by the grievant and the matter proceeded to arbitration, where it was upheld as having been imposed for just cause. In August, 2009, the grievant received a "2nd and Final Written Warning" for having been disrespectful in addressing a resident and touching the resident without explaining the procedure that the grievant would be applying to the resident. The grievant did not file a union grievance with respect to that warning.

The incident that led to the termination of the grievant's employment occurred between March 20 and 24, 2010. The grievant worked the night shift from 11 p.m. on Saturday, March 20, until 7 a.m. on Sunday, March 21. She was assigned to work on the "Riverside Unit,"

---

[1] Other disciplinary actions are removed from an employee's personnel file after twelve months.

along with charge nurse Dezra Leonard. The shift supervisor, registered nurse Gay Muizulles, and another certified nursing assistant, Laurel Johnson, were working on the "Woodside Unit." At some point during the night shift, Johnson came over from Woodside to Riverside and had a conversation with Leonard. Although the grievant was not a participant in this conversation, from where she was working in a resident's room she overheard part of the conversation, namely, Johnson talking about a resident on Woodside who had been crying. The grievant further overheard Johnson state to Leonard something to the effect of, "[i]f the supervisor wasn't so rude, I would have picked up more residents," or, "[t]hat's what Gay (Muizulles, the shift supervisor) gets, for not calling Kim." The grievant came out into the hall and asked who had been crying. Leonard did not respond. The grievant asked Johnson, who replied that she would talk with the grievant later. Both the grievant and Johnson, however, were busy and did not have the opportunity to talk further before their shifts ended.

From what the grievant had overheard, her sense was that "[i]t could have been abuse, but I was not sure." She knew that Muizulles was involved and that a patient had been crying. Before her shift ended, the grievant went over to Woodside "to snoop" around to see who was crying. The residents were all asleep, however, and no one was crying.

The grievant next worked from 11 p.m. on Sunday to 7 a.m. on Monday, again with Muizulles as the shift supervisor. She then worked again on the Monday night to Tuesday morning shift, this time on Woodside. During that shift, she spoke to a resident, CJ, who told her that, on the previous Saturday night, Muizulles had been somewhat rough as she helped CJ in getting her legs up onto her bed, had spoken gruffly to CJ and had turned down the television without asking CJ's permission. CJ's roommate confirmed that this had upset CJ,

who had cried for some time after the incident. The grievant realized that this likely was the incident of a crying resident about which she had overheard on the Saturday night shift. The grievant comforted CJ, explained to her that she should not have been subjected to such treatment and that she should feel comfortable about reporting it. The grievant suggested that she could arrange for someone to come and speak to CJ about what had happened to her, and CJ agreed.

The grievant went home, and then telephoned in to speak with the social worker at the facility to report what CJ had told her. The social worker was not in, but the grievant left a message in the social worker's voice mail box, and during the course of the day she left three separate, lengthy recorded messages for the social worker, reporting what CJ had told her and urging the social worker to talk to CJ in order to hear CJ's concerns directly from CJ.

The arbitrator also found that the plaintiff carried out a very thorough investigation of the possibility of patient abuse by Muizulles in her treatment of CJ. The ultimate conclusion was that Muizulles had acted insensitively toward CJ, but that the insensitivity had not risen to the level of abuse or neglect. Given Muizulles' twenty years of employment with the plaintiff with no prior discipline on her record, the plaintiff gave her a five day suspension and final warning. It was during that investigation regarding Muizulles' conduct that the plaintiff obtained the information that led it to conclude that three other staff members—Johnson, the assistant director of nursing, and the grievant—had failed to fulfill their obligation promptly to report possible abuse by Muizulles. Johnson was issued a final warning and a two day suspension for failing to report a complaint made by a resident regarding possible abuse by another staff member. The assistant director of nursing was suspended because, once she was informed by the

social worker of the possible abuse of CJ, she failed immediately to notify the director of nursing or the administrator of the plaintiff's facility. Although the assistant nursing director initiated an investigation, she failed to inform her superiors immediately as required by policy.

Regarding the grievant, the plaintiff reached the following conclusions: "[The grievant] had a final warning in her employee file and termination was appropriate. [She] stated that she was concerned about overhearing another employee discuss a resident who was crying after receiving assistance from another employee. Although [the grievant] stated she overheard this information, she did not report it until Tuesday, March 23, in which [she] left a voice message for the social worker. According to [the grievant], what she heard on Saturday, March 20, bothered her to the point where she felt she needed to go to the other side [Woodside] to investigate however, towards the end of the shift and the resident was found sleeping at that time. [The grievant] worked the 11-7 shift on Monday, March 22 and was assigned to the unit of the resident in question. [The grievant] states that the resident told her what happened on [Saturday] and [the grievant] stated that she told the resident that it was not right. . . . Given this course of events, it would appear that the grievant failed to report an allegation of abuse timely."[2]

---

[2] The arbitrator also noted that, in contrast to the thorough investigation of possible abuse by Muizulles, the plaintiff did not carry out a separate investigation of the possibility that the grievant had failed to make a timely report of possible patient abuse. Rather, the arbitrator found, the defendant terminated the grievant's employment as a result of having relied on the information that had come to its attention in the course of the Muizulles investigation, without ever inviting the grievant to respond directly to the plaintiff's concerns about possible misconduct on her part. Nonetheless, this was not the basis of the arbitrator's award reducing the grievant's termination to a suspension. Indeed, the arbitrator specifically found, on the basis of the evidence presented to him, that, as we will discuss, the grievant failed to timely report to a nursing supervisor, or higher authority, that another staff member may have committed resident abuse. And the

The arbitrator further found that the record clearly and convincingly established that the grievant learned, on the March 20-21 night shift, that Muizulles may have committed resident abuse in her treatment of a patient that night. The grievant's own state of mind from what she overheard was, "[i]t could have been abuse, but I was not sure." She was concerned enough about what had happened that she went over to Woodside to see if she could figure out what had happened. Yet, she went home without reporting the information that had come into her possession.

The arbitrator found further that all employees, including the grievant, "are trained that whenever they have information that resident abuse *may* have occurred, from wherever tha[t] information may have come, they must report to a nursing supervisor or higher authority. Frankly, to suggest otherwise flies in the face of why reporting is required, to maximize the protection that can be given to residents to avoid the risk of occurrences or re-occurrences of possibly abusive behaviors." (Emphasis in original.) The arbitrator continued: "The testimony of the management witnesses, the norms in the training of [certified nursing assistants], and simple common sense confirm that the grievant knew she had an obligation to report in a timely manner, given what she had overheard on the night of March 20, 21, even though she did not personally observe Muizulles' questionable behaviors." The arbitrator noted further that, because it was the night shift supervisor, Muizulles, who may have committed the abuse, the grievant was required to report to someone other than Muizulles in the proper line of authority. The grievant had other suitable options available to her, however,

---

defendant does not claim that the arbitrator's finding of fact in this regard was flawed because of this purported flaw in the plaintiff's investigative process. See also footnote 3 of this opinion. We discuss this finding of the arbitrator more fully in our response to the dissent in this case.

such as waiting to see the day shift supervisor who was coming on duty in the morning as the grievant ended her night shift, or calling the director of nursing, the administrator or any other nurse supervisor. Instead, the grievant did not report to anyone until March 23, and that reporting, as the arbitrator found, was not to anyone in the proper line of authority, but to the social worker by telephone messages.

The arbitrator stated that "[q]uite clearly . . . the grievant was guilty of the offense of failing to timely report to a nursing supervisor (or higher authority) the information that had come into her possession on March 20, which information suggested to the grievant that another staff member may have committed resident abuse. The remaining question is whether that misconduct provided the [plaintiff] with just cause to terminate the grievant's employment."

In answering this question, the arbitrator deemed "fair arguments in support of the requirement of immediate reporting" that "a delay in reporting is almost as bad as not reporting at all. The [plaintiff] notes that it is under a clear, statutory obligation to report immediately to the state regulatory body whenever there has been an event of possible resident abuse. That obligation only can be fulfilled if employees report in a timely manner. Moreover, and more fundamentally, any delay in reporting by a staff member leaves the residents at risk of possible further abuse by the alleged perpetrator; corrective action by [the plaintiff] to assure resident well-being inevitably is delayed if reporting by staff is delayed."

Nonetheless, the arbitrator concluded that it was "an important mitigating fact that the grievant was the one who actually came forward, although belatedly, and made the [plaintiff] aware of the problem. If the grievant had not come forward on March 23, it is quite likely

that the [plaintiff] never would have learned of the insensitive treatment given by Muizulles, nor of the failure to report by multiple staff members. It is important to recognize that contribution which the grievant made, then, albeit belatedly, to help assure the well-being of the residents [of the plaintiff]."[3]

The arbitrator also reasoned that the plaintiff should "not want to create a huge disincentive to reporting, if and when an employee for whatever reason has hesitated or delayed in reporting possible resident abuse. If the disciplinary approach is, once you have delayed you will be terminated even if you then make a belated report, then that creates a perverse incentive to never report. The belated reporter ends up being fired as the direct consequence of not coming forward."

Thus, the arbitrator stated as follows: "The grievant did fail to make a timely report of what she had learned on March 20. She knew the rule that she had to report, and to do so without delay. She failed to fulfill that responsibility in a timely manner. And, she had a poor disciplinary record, so that placed her in a worse position than the other staff members involved in the March, 2010 incident involving CJ. On the other hand, there is the significant mitigating factor that it was the grievant, not the others, who did come forward and report to the

---

[3] The arbitrator rejected the plaintiff's claim that the content of the grievant's telephone calls to the social worker indicated that the grievant had also been aware of prior instances of possibly abusive treatment of residents by Muizulles and had failed to report them. The reason for the arbitrator's rejection of this claim was what he found to be the plaintiff's lack of any further investigation in response to this information that the plaintiff had learned from those calls. The arbitrator stated: "Given that absolute lack of any investigation regarding what the grievant may have intended to convey by her comments in the phone messages, the [plaintiff] cannot rely at arbitration upon an argument that the grievant in fact had knowledge of possible abuse prior to March 20, but made no report." In this appeal, the plaintiff does not rely, in the context of its public policy argument, on the contents of those calls. We, therefore, do not consider them either. See also footnote 2 of this opinion.

[plaintiff], although belatedly; and it was her reporting which allowed the [plaintiff] to take corrective actions." The arbitrator concluded that, because of this mitigating factor, the plaintiff lacked just cause to terminate the grievant's employment.

The plaintiff claims that the arbitrator's award must be vacated because it violates "the strong public policy of protecting residents in skilled nursing facilities, including the public policy of promptly and properly reporting patient abuse in such facilities." More specifically, the plaintiff argues that the award violates this public policy "by *de facto* prohibiting the discharge of any employee who reports abuse, no matter how late or improperly, as long as the employee *eventually* reports the abuse, and by ordering the reinstatement of the particular employee in this case, who has definitively demonstrated an unwillingness or inability to meet her obligations to ensure resident safety." (Emphasis in original.) We agree that the award violates the strong public policy of protecting residents of skilled nursing facilities from abuse.

We first address our scope of review regarding the plaintiff's claim. Ordinarily, where there is a consensual, unrestricted submission to arbitration,[4] the only question is whether the award conforms to the submission. *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.*, 252 Conn. 416, 427, 747 A.2d 1017 (2000). One exception to that rule, however, is where the award violates clear public policy. Id., 428. Where a party challenges an award on the ground that it violates public policy, de novo review is in order if the challenge has a legitimate, colorable basis. Id., 429. That de novo review is limited, however, to the two critical questions: (1) whether there is an explicit, well-defined and dominant public policy and (2) whether the award violates

---

[4] The parties in the present case acknowledge that this was a consensual, unrestricted submission.

that policy. *State* v. *AFSCME Council 4, Local 387, AFL-CIO*, 252 Conn. 467, 476, 747 A.2d 480 (2000). It does not extend to the facts found by the arbitrator. *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.*, supra, 432. This necessarily means, therefore, that, if the plaintiff has established a legitimate, colorable basis for its public policy challenge to the arbitrator's reinstatement decision, although we defer to the historical facts found by the arbitrator, the arbitrator's conclusion of no just cause for termination is not entitled to deference but is, instead, subject to our de novo review to determine whether it is in violation of public policy. We conclude that, on the basis of these principles, the plaintiff's claim is subject to de novo review.

We agree with the plaintiff that Connecticut has a clear, well-defined and dominant public policy of protecting patients in facilities, such as those of the plaintiff, from abuse, and that this policy includes the prompt reporting of any incident of suspected abuse. Our statutory patients' bill of rights; General Statutes §§ 19a-550 and 19a-550a; provides that any patient of a "nursing home facility"; General Statutes § 19a-550a (a) (1); shall be "free from mental and physical abuse . . . ." General Statutes § 19a-550 (8); see also *State* v. *New England Health Care Employees Union*, 271 Conn. 127, 138, 855 A.2d 964 (2004) ("there is an explicit, well-defined and dominant public policy against the mistreatment of persons in the . . . custody [of the department of mental retardation]").

Furthermore, this policy includes the prompt reporting of any incident of suspected abuse. Generally speaking, all employees of such facilities who have reasonable cause to suspect abuse of a patient are required by General Statutes § 17b-451,[5] under criminal penalties, to report the same to the commissioner of social

[5] General Statutes § 17b-451 (a) provides in relevant part: "Any . . . registered nurse, any nursing home administrator, nurse's aide or orderly in a nursing home facility, any person paid for caring for a patient in a nursing

services within seventy-two hours after such suspicion arose. In order for that policy to be effective, there must be strong institutional rules requiring employees who deal directly with patients promptly and properly to report cases of suspected abuse, because they are the ones to whose attention those cases are most likely to come. Thus, the plaintiff has chosen to implement this statutory policy by requiring its employees promptly to report cases of suspected abuse through its own chain of command, so that the employer itself can then meet its statutory responsibility to make such a report, if warranted, to the commissioner of social services within the requisite seventy-two hours.

The obvious purpose of these provisions is to protect from abuse those among us who are most vulnerable and most dependent for their well-being on their institutional caregivers. And the equally obvious purpose of the concomitant prompt and proper reporting requirement is to ensure that incidents of possible abuse are quickly addressed by the responsible institutional actors, so that they do not leave time for their continuation or repetition before serious consequences ensue to the abused resident.

We also conclude that the plaintiff's claim of a violation of this policy has a colorable and legitimate basis.

home facility, any staff person employed by a nursing home facility . . . who has reasonable cause to suspect or believe that any elderly person has been abused, neglected, exploited or abandoned, or is in a condition which is the result of such abuse, neglect, exploitation or abandonment, or is in need of protective services, shall, not later than seventy-two hours after such suspicion or belief arose, report such information or cause a report to be made in any reasonable manner to the Commissioner of Social Services or to the person or persons designated by the commissioner to receive such reports. Any person required to report under the provisions of this section who fails to make such report within the prescribed time period shall be fined not more than five hundred dollars, except that, if such person intentionally fails to make such report within the prescribed time period, such person shall be guilty of a class C misdemeanor for the first offense and a class A misdemeanor for any subsequent offense."

We therefore apply de novo review to the question of whether the reinstatement of the grievant violated public policy. *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.*, supra, 252 Conn. 428–29.

Applying that review, we conclude that the award violates that public policy. We do so because of a confluence of factors arising under the facts and circumstances of the case. The grievant had a prior incident of patient abuse dating from 2005, which resulted in a final warning. Then, in April, 2009, she received a written warning for an incident that involved, in part, speaking rudely, loudly and in a scolding manner to a resident, and in August, 2009, she received a second final warning for behaving disrespectfully and inappropriately toward a resident. Finally, in the present incident, in March, 2010, despite being fully aware of her obligation promptly to report through proper channels her suspicions of patient abuse, and despite being aware that she was subject to two final warnings, the grievant did not report the suspected abuse until several days later, and then not through the proper channels.[6] The award, requiring the reinstatement of one who, in a sensitive position of physical authority over such a vulnerable population, has by her prior record of related disciplinary actions and two prior final warnings demonstrated her inability to meet the demands of the public policy

---

[6] While the grievant reported the suspected abuse arguably within seventy-two hours, the time period contained in § 17b-451, we emphasize that her report, almost three full days from when she first heard the information, was made to the facility social worker, instead of the requisite nursing supervisor or higher authority, which would have allowed the plaintiff to comply with the statutory reporting policy. Thus, whether the grievant reported within the statutory seventy-two hour time period, she still failed to do so promptly and through the proper channels as required by the plaintiff. Further, our conclusion that the award violates public policy is based not solely on the grievant's failure to report promptly but on her failure to do so through the proper channels and her past record of employee misconduct indicating her inability to meet the demands of the public policy of protection and reporting.

of protection and reporting, violates that policy because, in the very words of the arbitrator, "any delay in reporting by a staff member leaves the residents at risk of possible further abuse by the alleged perpetrator; corrective action by [the plaintiff] to assure resident well-being inevitably is delayed if reporting by staff is delayed."

Our conclusion in this respect is consistent with the similar result reached by the Illinois Appellate Court in the case of *Illinois Nurses Assn.* v. *Board of Trustees of University of Illinois*, 318 Ill. App. 3d 519, 741 N.E.2d 1014, leave to appeal denied, 194 Ill. 2d 567, 747 N.E.2d 352 (2001). In that case, the court held that the reinstatement, ordered by an arbitrator, of a nurse in a state university hospital who had engaged in unsafe nursing behavior violated the public policy favoring safe nursing care. A critical basis of the court's determination was the nurse's prior history, namely, that she "had displayed an inattentive work attitude and below average nursing skills since 1991." Id., 531. The court specifically contrasted that nurse's termination from the treatment afforded another nurse involved in the same case who had been ordered reinstated. The court rejected the employer's public policy challenge to the reinstatement, based upon that nurse's "20-year employment record without discipline . . . ." Id., 532.

Thus, we reject the defendant's claim that "[t]his case involves nothing more than a garden variety employee discharge grievance in which the employer is unhappy with the bargained for final and binding arbitrator's award," and, therefore, the usual deferential scope of review should apply.[7] The basis of this claim is that,

[7] Indeed, the defendant argues that, so long as the arbitrator has considered a grievant's prior disciplinary record—no matter how egregious—its ultimate conclusion of lack of just cause for termination must be afforded the traditional deference to an arbitrators' fact-finding. This argument fails because it overlooks the necessary consequence of the public policy exception, namely, that once a colorable, legitimate basis for the public policy exception has been established—as it has been here—de novo review, not deferential

although the cited public policy of protecting patients in nursing homes "arguably requir[es] prompt reporting of suspected abuse, [it] does not require the unreviewable discharge of employees who have been negligent in their duty to promptly report suspected abuse."

We agree that the public policy cited does not require the "unreviewable" discharge of an employee who has not complied with her duty promptly to report suspected abuse. We disagree, however, with the suggestion that concluding that this discharge violates the cited public policy means that any such discharge would be unreviewable. That simply is not the case. Any such discharge would certainly be reviewable by the courts, pursuant to our de novo review, and each would be decided on the basis of its particular facts and circumstances, as we have done in the present case.

We also reject the defendant's suggestion that there is no such explicit policy requiring the reinstatement of any employee who has at any time failed even once promptly to report suspected patient abuse and, therefore, this award must be upheld. We do not suggest that there is such a policy. Instead, the policy is as we have stated previously, and its application to the particular facts and circumstances of the present case requires the vacating of the award reinstating this employee, with a history of inability to comply with the policy and two prior final warnings. Indeed, those facts and circumstances show that the employer did not discharge the other employees precisely because their records were clear of any indication of such a history.

We also disagree with the defendant's reliance on *State* v. *New England Health Care Employees Union,* supra, 271 Conn. 127. In that case, the court held that,

---

review, is applied to the ultimate question of termination. See *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.,* supra, 252 Conn. 429.

although there is "an explicit, well-defined and dominant public policy against the mistreatment of persons in the . . . custody [of the department of mental health]"; id., 138; the reinstatement of the particular employee there did not violate that policy. Id., 142. That case is factually distinguishable, however.

In *New England Health Care Employees Union*, the court stated: "To conclude that the arbitrator's decision and award violated the public policy of protecting persons in the custody of the department from abuse, the court would have had to conclude that, if a single instance of deliberate conduct results in any injury to a client, no matter how inadvertent or minor, the conduct is grounds for termination, per se. We agree with the union that such a rule is not required to advance the public policy of protecting clients from mistreatment. Rather, an arbitrator reasonably may consider circumstances such as the length of employment, previous instances of harmful conduct by the employee, and the circumstances and severity of the misconduct under review in determining the likelihood of future misconduct and whether discipline less severe than termination would constitute a sufficient punishment and deterrent." Id., 138–39.

In the present case, by contrast, it was not a single case of misconduct that led to the dismissal. There was a history of three incidents of similar misconduct, including two prior final warnings, within a period of five years. In addition, the grievant's failure to report promptly was exacerbated by her failure to report through proper channels, thus increasing the risk that the suspected abuse would not be communicated promptly to the proper persons.

Further, we disagree with the defendant's argument that the award does not violate the public policy

because it was the grievant who ultimately came forward with the information, and that, as the arbitrator reasoned, "[i]f the disciplinary approach is, once you have delayed you will be terminated even if you then make a belated report, then that creates a perverse disincentive to never report. The belated reporter ends up fired as the direct consequence of coming forward." That argument may have weight in a case, such as *State* v. *New England Health Care Employees Union*, supra, 271 Conn. 127, in which the employee was dismissed for his very first incident of misconduct. Its weight diminishes greatly, however, in a case such as this, where the grievant has a history of similar misconduct indicating a risk of future misconduct, and where, as the record indicates, the employer did not follow a disciplinary approach of "once you have delayed you will be terminated," as indicated by the employer's more lenient treatment of the other employees who also failed to follow the public policy.

Finally, we turn to the contention of the dissent that our conclusion "has the unfortunate result of diminishing this court's respect for and deference to the private arbitration process, and . . . also results in an expansion of the public policy exception from its intended narrow application in these circumstances." We disagree.

First, to the extent that the dissent contends that the arbitrator's conclusion of no just cause for termination is entitled to the usual deference to the private arbitration process, the contention misapplies the public policy exception. As we have explained, our law is clear that, once the party challenging an arbitrator's award on the ground of the public policy exception has established that the challenge has a legitimate, colorable basis, any such deference disappears and the question of termination becomes one for our de novo determination. That is why it is characterized as the "public policy

exception"; it is an exception to the usual rule of deference to the arbitrator's factual and legal determinations. Indeed, if the dissent were correct in this regard, any determination by an arbitrator of no just cause for termination would be effectively insulated from judicial review and the public policy exception would be little more than a nullity. See, e.g., *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, supra, 252 Conn. 473 (public policy exception required termination of correction officer for making racial remarks about state legislator, despite arbitrator's conclusion of no just cause for termination). Second, we reject the dissent's contention that our decision is an "expansion of the public policy exception . . . ." It is, by contrast, simply an application of the public policy exception to the facts of the present case.

We also reject the dissent's contention that "[t]aken to its logical conclusion, the majority sets forth a rule that requires an employer to terminate the employment of any employee who does not report a suspicion of elder abuse immediately, without consideration of any mitigating factors or whether the employer itself would be in violation of any public policy." Of course, any decision of a court, taken to its logical conclusion, might result in an unwise policy. That is precisely why we have been careful to articulate that our decision does not apply to any such employee. This is, instead, a case of an employee who had a history of three incidents of similar misconduct within five years, including two prior final warnings, who exacerbated her misconduct by failing to report through proper channels, thus increasing the risk that the suspected abuse would not be addressed properly and promptly.

The remainder of the dissenting opinion focuses on the purported violation of the grievant's due process rights. In our view, the dissent's reading of the record

on this issue is not sufficiently comprehensive. Accordingly, some further elaboration of the procedural history of the case is required.

During the plaintiff's investigation of Muizulles' conduct, the plaintiff discovered the grievant's, as well as Johnson's and the assistant director of nursing's, failure to report Muizulles' suspected abuse promptly and through proper channels. That investigation also disclosed that, in the course of the grievant's three lengthy telephone messages for the social worker, again in the language of the arbitrator, "the grievant included some comments which the [plaintiff] interpreted as showing that the grievant (and other staff members) prior to March 20 had been aware of other instances of possible patient abuse by . . . Muizulles, but neither the grievant nor anyone else had reported those prior instances."

During the arbitration hearing, the plaintiff urged the arbitrator to take the grievant's comments in those three telephone conversations into account as aggravating circumstances "above and beyond the grievant's pre-existing disciplinary record," as showing that the grievant "had failed to report those situations at all" and, therefore, according to the plaintiff, the termination was for just cause. It was in this context that the arbitrator's statements about the grievant's due process rights arose.

The arbitrator squarely rejected this evidence and expressly gave it "no weight in assessing whether there was just cause to terminate . . . ." The explicit reason for this rejection was stated by the arbitrator: "[T]he [defendant] is correct that the [plaintiff] did nothing to further investigate in response to *this information, which the [plaintiff] had learned from the grievant's telephone messages to the social worker.* The grievant never was told that the [plaintiff] was concerned *about these comments she had made in her messages,* and

most importantly, she never was given the opportunity to respond with any explanation or clarification that she might wish to provide. . . . Given that absolute lack of any investigation *regarding what the grievant may have intended to convey by her comments in the phone messages,* the [plaintiff] cannot rely at arbitration upon an argument that the grievant in fact had knowledge of possible abuse prior to March 20, but made no report. The grievant in the pretermination investigative process never was made aware of the [plaintiff]'s concern *in that regard,* and never was given any opportunity to respon[d], explain or clarify." (Emphasis added.)

This passage makes it clear that the evidence regarding whether the grievant's purported due process rights were violated was expressly rejected by the arbitrator for precisely that reason and, therefore, played absolutely no part in the determination of whether the termination was for just cause. It was, instead, evidence of the grievant's purported admissions in her three telephone messages to the social worker that the arbitrator refused to consider as aggravating factors against her. It did not contribute in any way to the arbitrator's decision and, therefore, could not have harmed the grievant in any way. Indeed, it only entered this case on appeal as part of the *plaintiff's* argument on its *second* claim, namely, that the arbitrator should have considered it and, therefore, exceeded his authority, a claim that, as we have said, we need not consider. See footnote 3 of this opinion.

Furthermore, the record is quite clear that, despite the plaintiff's failure independently to investigate the grievant's—as opposed to Muizulles'—conduct, the grievant had her full opportunity to give her side of the story to the arbitrator, which she did. And the record is equally clear that on three occasions the arbitrator

expressly disbelieved her.[8] Moreover, the arbitrator, as we have already explained, found on the basis of all the evidence, including the grievant's testimony, that "[q]uite clearly, then, the grievant was guilty of the offense of failing to timely report to a nursing supervisor (or higher authority) the information that had come into her possession on March 20, which information suggested to the grievant that another staff member may have committed resident abuse."

The judgment is reversed and the case is remanded with direction to render judgment granting the plaintiff's application to vacate the award and denying the defendant's cross application to confirm the award.

In this opinion DiPENTIMA, C. J., concurred.

BEAR, J., dissenting. The grievant, Leoni Spence, an employee of the plaintiff, Burr Road Operating Company II, LLC, operating as Westport Health Care Center, and a member of the defendant, New England Health Care Employees Union, District 1199, had her employment terminated by the plaintiff after she reported to

---

[8] The grievant testified that, although she was aware of the August, 2009 written warning, she was unaware that it was a *final* warning. The arbitrator found, however, that she received the actual document and that, as a union delegate, she would have read it with care and noted the "final" notations as having important significance.

The grievant also testified before the arbitrator that, before she went home at the end of her shift, she informed the charge nurse about the suspected abuse. The arbitrator expressly "discredit[ed] this testimony that the grievant reported to [the charge nurse] before the grievant went home at shift end."

Finally, the grievant also testified at the arbitration hearing "that it was her belief . . . she could fulfill her reporting requirement by telling her charge nurse." The arbitrator rejected this testimony because the grievant had also testified that the charge nurse on her unit "is *not* her supervisor; the supervisor is the registered nurse who is the designated shift supervisor. The training which the grievant had received regarding the reporting obligation was quite clear, that the report must go to the 'nursing supervisor,' or higher authority." (Emphasis in original.)

a social worker, who also was employed by the plaintiff, that she had reason to suspect that one of her coworkers had abused a patient. After Spence's employment was terminated, the defendant sought arbitration pursuant to its contract with the plaintiff. After the arbitration hearing was completed, the arbitrator found no just cause for the plaintiff to have terminated Spence's employment, but he did determine that there was just cause for her to have been suspended from her job for thirty days without pay. The plaintiff moved to vacate the award in the trial court, but the court affirmed the award. The plaintiff appealed to this court, and based on a general public policy of this state protecting patients in nursing homes from abuse, the majority has decided to reverse the judgment of the court, to vacate the award, and to reinstate the plaintiff's termination of Spence's employment. I respectfully dissent.

The following facts are helpful to an understanding of the basis for my disagreement with the result reached by the majority. While on duty in the Riverside unit of the plaintiff's facility during the night shift, which began on Saturday, March 20, 2010, Spence, who is a certified nursing assistant, overheard two other employees, namely, a charge nurse who also was working in the Riverside unit, and another certified nursing assistant, who had been working in the Woodside unit, discussing a patient who had been crying, but the name of that patient was not mentioned. Spence discerned that the incident had occurred in the Woodside unit of the facility, and that Gay Muizulles, a registered nurse, who also was the shift supervisor, had been involved. Spence asked the other employees for more information, but they declined at that time. Spence was concerned that there might have been patient abuse, and she went over to the Woodside unit to investigate before the end of her shift. When she arrived at that unit, however, all of the residents were asleep. She did not report her

suspicions to the incoming supervisor. On her next work shift, which began on Sunday, March 21, 2010, she also worked in the Riverside unit under Muizulles' supervision. On her next work shift, however, which began on Monday, March 22, 2010, Spence worked in the Woodside unit, discovered the name of the patient involved in the incident and confirmed that the patient was upset by the treatment she had received from Muizulles during the prior Saturday night shift. Spence comforted the resident and asked her if she would like Spence to arrange for someone to come in to speak to her about what had happened; the resident responded affirmatively.

After her shift ended, on March 23, 2010, Spence telephoned a social worker at the facility and left several lengthy messages about the patient. Spence was the only employee to report this suspected abuse to any representative of the plaintiff, despite other employees, including a charge nurse, having knowledge of the events. After investigating Spence's report, the plaintiff disciplined several of its employees.[1] Although other employees were suspended for various periods, Spence was the sole employee whose employment was terminated, the basis for which, according to the plaintiff, was that she had failed to report a suspicion of patient abuse in a timely manner.[2] If Spence had not reported

---

[1] Following its investigation, the plaintiff found that, although Muizulles had acted insensitively toward the resident in question, she had not abused or neglected the resident. Muizulles, who had no prior disciplinary record, was suspended for five days and given a final warning. The certified nursing assistant whom Spence had overheard discussing the incident with a charge nurse received a two day suspension and a final warning for failing to report it. The assistant director of nursing also was suspended because she failed to follow the proper notification procedure after the social worker informed her of these events. Finally, there is nothing in the record regarding any discipline administered to the charge nurse whom Spence overheard discussing the incident.

[2] The general public policy against patient neglect, mistreatment or abuse that is relied on by the majority and was considered by the arbitrator is reflected in General Statutes § 17b-451 (a): "Any . . . registered nurse, any

such suspected abuse, however, the plaintiff would not have learned about it because no other employee had come forward as did Spence.[3] Because the plaintiff began to focus on Spence in the course of its investigation after her report, and it made its decision to terminate Spence's employment without any additional contact with her, it afforded Spence no pretermination hearing or meeting, and Spence had no opportunity to explain her actions or to defend herself from the plaintiff's charges. The arbitrator found that "[i]n contrast to the very thorough investigation of the possibility of resident abuse by Muizulles, the [plaintiff] carried out no separate investigation of the possibility that [Spence] had failed to make a timely report of possible patient abuse. [Spence] was never expressly informed that [the plaintiff] was at that point investigating *her* possible misconduct of failing to make a timely report of possible patient abuse, based upon information that had come to [Spence's] attention on March 20, on March 22, or on other unspecified occasions prior to the incident of

nursing home administrator, nurse's aide or orderly in a nursing home facility, any person paid for caring for a patient in a nursing home facility, any staff person employed by a nursing home facility, any . . . social worker . . . who has reasonable cause to suspect or believe that any elderly person has been abused, neglected, exploited or abandoned, or is in a condition which is the result of such abuse, neglect, exploitation or abandonment, or is in need of protective services, shall, not later than seventy-two hours after such suspicion or belief arose, report such information or cause a report to be made in any reasonable manner to the Commissioner of Social Services or to the person or persons designated by the commissioner to receive such reports. . . ."

[3] This case has a subtext of the age old response of unfair punishment of the bearer of bad tidings. "[T]he notion of 'shooting the messenger' dates back to Sophocles and Shakespeare . . . ." *RHJ Medical Center, Inc.* v. *Dubois*, 754 F. Sup. 2d 723, 764 and nn.41–42 (W.D. Pa. 2010), referencing Sophocles, Sophocles, Volume II. Antigone. The Women of Trachis. Philoctetes. Oedipus at Colonus (Hugh Lloyd-Jones trans., Loeb Classical Library 1994) (442 B.C.) ("[n]o one loves the messenger who brings bad news . . ." [internal quotation marks omitted]), and William Shakespeare, Anthony and Cleopatra, act 1, sc. 2 ("[t]he nature of bad news infects the teller . . ." [internal quotation marks omitted]), respectively.

March 20. [Spence] was never asked to give her side of the story regarding those possible failures to timely report. Rather, the [plaintiff] in deciding to terminate [Spence's employment] simply relied on information that had come to its attention in the course of its investigation regarding Muizulles, without ever inviting [Spence] to respond directly to the [plaintiff's] concerns about possible misconduct on her part."

The arbitrator determined that Spence was guilty of the offense of failing to report to a proper person, in a timely manner, the information that she had learned during her shift, which began on March 20, 2010. The arbitrator also determined that an important mitigating consideration in Spence's favor was that Spence was the sole employee to make a report of the possible patient abuse. The arbitrator stated that the "hard question in this case" was whether that mitigating consideration was sufficient to require that the plaintiff impose on Spence some discipline short of termination, despite her prior disciplinary record.[4] The arbitrator concluded that in view of this important mitigating consideration, the plaintiff lacked just cause to terminate Spence's employment. The arbitrator also determined, however, that "[s]evere disciplinary action just short of termination was warranted" and he determined that the plaintiff had just cause to suspend Spence for one month without pay and to issue her a final warning.

The majority, despite the broad discretion provided to the arbitrator pursuant to the unrestricted submission, and our long-standing case law requiring respect

---

[4] Spence's previous disciplinary record included: (1) a prior incident of patient abuse in 2005; (2) a written warning in April, 2009, for speaking in an inappropriate manner to a resident and for being insubordinate and disrespectful to Muizulles, her shift supervisor; and (3) a "2nd" and "final" written warning for addressing a resident in a disrespectful manner and for touching the resident without giving the resident an explanation of the procedure she was performing.

for and deference to a decision of an arbitrator in a private arbitration, reverses the decision of the court upholding the finding of the arbitrator that, on the facts of this case, there was no just cause for the termination of Spence's employment, and it concludes, rather, that the termination of her employment is supported by the public policy relating to protection of patients from abuse.[5]

The trial court affirmed the arbitrator's award. It noted that the public policy, on which the majority relies, did not apply to all of the actions of the arbitrator: "Given that a clear, dominant, well-defined public policy exists, the question is whether the award violates that public policy in ordering the reinstatement of an employee with a documented history in regard to patient abuse. There is no established dominant public policy against reinstating an employee who was terminated for failure to promptly report suspected abuse. Likewise, there is no dominant public policy against arbitrators considering mitigating facts under circumstances where the employee does have a record of prior abuse. As evidenced in *State* v. *New England Health Care Employees Union,* [271 Conn. 127, 138, 855 A.2d 964 (2004)], to conclude that the arbitrator's award violated the public policy of protecting nursing home patients from abuse would be to conclude that an employee's failure to timely report abuse is grounds for termination per se. Such a rule is not required to advance the public policy of protecting nursing home patients. Further, the arbitrator's award did not violate public policy by considering mitigating factors. Id., 139. An arbitrator may reasonably consider circumstances

---

[5] The issue stipulated by the parties for decision by the arbitrator was: "Was Leoni Spence terminated for just cause? If not, what shall the remedy be?" The award of the arbitrator in direct response to that stipulated issue was in relevant part as follows: "The [plaintiff] lacked just cause to terminate [Spence's] employment. However, the [plaintiff] had just cause to suspend [Spence] without pay for a month and to issue her a final warning."

including the severity of the misconduct under review. Id. The arbitrator's award does not absolve any employee who eventually reports suspected abuse, rather, the arbitrator finds that termination per se is not the appropriate punishment and finds just cause for a one month suspension without pay and a final warning. Therefore, it is concluded that the arbitrator's decision does not violate public policy."

In *New England Health Care Employees Union,* our Supreme Court discussed and analyzed an incident where an employee deliberately shoved a patient and injured him, and it rejected any per se rule of automatic termination for a violation of the applicable public policy protecting clients of the then named department of mental retardation (department): "The arbitrator found that [the employee] had deliberately shoved [the client] into the chair and concluded that he was 'culpable of patient or client abuse under these circumstances.' The arbitrator then noted that the union had cited eleven cases where department employees had been disciplined instead of discharged, notwithstanding a finding of client abuse. Although he determined that the cases cited by the union were not similar factually to this case, the arbitrator found that 'the state does not automatically terminate employees for patient abuse.' He further concluded: 'From the arbitration awards, each involving the state and this union, I can only conclude that each case was decided on its own individual merits and that misconduct as serious as client abuse need not always provide just cause for an employee's dismissal.' The arbitrator determined that although [the employee] 'could have and should have exercised better judgment . . . [i]t was because the patient was swinging his arms about in an agitated state that [the employee] reacted improperly by holding onto his arms and [shoving] him into a chair.' In light of his factual

findings, coupled with his analysis of the other arbitration awards involving the state and the union, the arbitrator concluded that 'while . . . the state had just cause to discipline [the employee],' it 'did not have just cause to dismiss [him].' The arbitrator then directed the department to reinstate [the employee] with lost pay and benefits, except for a thirty day disciplinary suspension period." *State* v. *New England Health Care Employees Union*, supra, 271 Conn. 131–32. On appeal, the trial court affirmed the award, concluding that " 'the unforeseeability and exigency of the situation coupled with . . . [the employee's] attempt to control the client [and] defuse the situation . . . lead the court to conclude that the reinstatement of . . . [the employee] is not violative of [the] public policy of protecting persons with mental retardation . . . .' " Id., 133.

In *New England Health Care Employees Union*, the state argued that the trial court improperly granted the union's application to confirm the arbitrator's award ordering the employee's reinstatement despite the arbitrator's finding that the employee had abused a client, because there is a clear and dominant public policy, expressed in numerous statutes and regulations, requiring the department to provide its clients with an environment free from the risk of abuse by its employees. Id., 136–37. The union countered that the trial court properly confirmed the arbitrator's award because it did not violate the explicit, well-defined and dominant public policy of this state as set forth in General Statutes § 17a-247c. Id. Our Supreme Court agreed with the union, and affirmed the arbitrator's award, explaining its reasoning as follows: "Addressing the second prong of the inquiry—whether the arbitrator's award violated the public policy of protecting persons in the custody of the department from abuse—the trial court concluded that, because [the employee] had not intended to harm the client and had never been disciplined for abusing

a client prior to this incident, the record did not support a finding that continuing [the employee's] employment would place department clients at risk of abuse. It concluded, therefore, that reinstating [the employee] would not violate public policy. We agree. To conclude that the arbitrator's decision and award violated the public policy of protecting persons in the custody of the department from abuse, the court would have had to conclude that, if a single instance of deliberate conduct results in any injury to a client, no matter how inadvertent or minor, the conduct is grounds for termination, per se. We agree with the union that such a rule is not required to advance the public policy of protecting clients from mistreatment. *Rather, an arbitrator reasonably may consider circumstances such as the length of employment, previous instances of harmful conduct by the employee, and the circumstances and severity of the misconduct under review in determining the likelihood of future misconduct and whether discipline less severe than termination would constitute a sufficient punishment and deterrent. We also agree with the union that the rule urged by the state effectively would grant authority to the state to discharge an employee for such conduct without review, thereby undermining both the collective bargaining process and the arbitration process voluntarily agreed to by the parties.* Accordingly, we conclude that the trial court properly concluded that the arbitrator's decision and award did not violate the public policy of protecting department clients from mistreatment." (Emphasis added.) Id., 138–39.

In view of our Supreme Court's clear analysis of the proper application of public policy considerations in *New England Health Care Employees Union,* I cannot agree with the majority's application of such public policy solely to reverse the arbitrator's determination

that "[s]evere disciplinary action just short of termination was warranted" in the form of a thirty day suspension without pay for the even more severe termination of employment that the majority imposes.

The majority's elevation of the general public policy relating to protection of patients from abuse results, in this case, in such public policy improperly and unnecessarily displacing our courts' long-standing protection of the private arbitration process, which has been supported, respected and deferred to by our courts for decades. "This court has for many years wholeheartedly endorsed arbitration as an effective alternative method of settling disputes intended to avoid the formalities, delay, expense and vexation of ordinary litigation. . . . When arbitration is created by contract, we recognize that its autonomy can only be preserved by minimal judicial intervention. . . . Because the parties themselves, by virtue of the submission, frame the issues to be resolved and define the scope of the arbitrator's powers, the parties are generally bound by the resulting award. . . . [Finally] [t]he party challenging the award bears the burden of producing evidence sufficient to invalidate or avoid it . . . ." (Citations omitted; internal quotation marks omitted.) *O & G/O'Connell Joint Venture* v. *Chase Family Ltd. Partnership No. 3*, 203 Conn. 133, 145–46, 523 A.2d 1271 (1987); see also *Stutz* v. *Shepard*, 279 Conn. 115, 129–30, 901 A.2d 33 (2006) (expressing "clear preference for making every reasonable presumption in favor of the arbitration award and the arbitrator's acts and proceedings"); *Board of Education* v. *Civil Service Employees Affiliates, Local 760*, 88 Conn. App. 559, 566–67, 870 A.2d 473 (2005) ("in applying this general rule of deference to an arbitrator's award, [e]very reasonable presumption and intendment will be made in favor of the [arbitral] award and of the arbitrators' acts and proceedings" [internal quotation marks omitted]); *Metropolitan District Commission* v.

*AFSCME, Council 4, Local 184,* 37 Conn. App. 1, 7, 654 A.2d 384 (1995) ("the trial court [is] required to presume that the actions of the [arbitrator] were proper" in the absence of affirmative evidence to the contrary), aff'd, 237 Conn. 114, 676 A.2d 825 (1996).

With respect to the public policy exception, "[a] two-step analysis . . . [is] often employed . . . . First, the court determines whether an explicit, well-defined and dominant public policy can be identified. If so, the court then decides if the arbitrator's award violated the public policy. . . . We note that [t]he party challenging the award bears the burden of proving that illegality or conflict with public policy is clearly demonstrated. . . . Therefore, given the narrow scope of the public policy limitation on arbitral authority, the plaintiff can prevail . . . only if it demonstrates that the [arbitrators'] award clearly violates an established public policy mandate. . . . It bears emphasizing, moreover, that implicit in the stringent and narrow confines of this exception to the rule of deference to arbitrators' determinations, is the notion that the exception must not be interpreted so broadly as to swallow the rule. . . . *Hartford* v. *Hartford Municipal Employees Assn.,* [134 Conn. App. 559, 568, 39 A.3d 1146, cert. denied, 305 Conn. 904, 44 A.3d 180 (2012)]." (Internal quotation marks omitted.) *Stratford* v. *AFSCME, Council 15, Local 407,* 140 Conn. App. 587, 592–93, 60 A.3d 288 (2013).

As set forth previously in this dissenting opinion, in contrast to the very thorough investigation of the possibility of resident abuse by Muizulles, the plaintiff carried out no separate investigation of the allegations against Spence, including the possibility that Spence had failed to make a timely report of possible patient abuse. Spence never was informed expressly that the plaintiff was at that point investigating her possible misconduct of failing to make a timely report of possible

patient abuse, based upon information that had come to Spence's attention during her night shift beginning on March 20, or on other unspecified occasions prior to the incident of March 20. Spence never was asked by the plaintiff to give her side of the story regarding a possible failure to report her suspicion in a timely manner. Rather, the plaintiff in deciding to terminate Spence's employment simply relied on information that had come to its attention in the course of its investigation regarding Muizulles, without ever inviting Spence to respond directly to the plaintiff's concerns about possible misconduct on her part. The arbitrator also found that "[h]owever, the [defendant] is correct that the [plaintiff] did nothing to further investigate in response to the information which the [plaintiff] had learned from [Spence's] telephone messages to the social worker. [Spence] never was told that the [plaintiff] was concerned about these comments [about possible additional instances of abuse by Muizulles] she had made in her messages, and most importantly, she never was given the opportunity to respond with any explanation or clarification that she might wish to provide. The most rudimentary due process was not afforded to [Spence]. Given that absolute lack of any investigation regarding what [Spence] may have intended to convey by her comments in the phone messages, the [plaintiff] cannot rely at arbitration upon an argument that [Spence] in fact had knowledge of possible abuse prior to March 20, but made no report." The arbitrator thus found that the procedure, or lack thereof, utilized by the plaintiff in deciding to terminate Spence's employment woefully was inadequate, and that it clearly denied her contractual due process.

After thoroughly weighing the claims of the parties, including the plaintiff's complete failure to afford Spence notice of its claims and the opportunity for a pretermination presentation of her position in response

thereto, and the criteria set forth in *New England Health Care Employees Union*, including the length of her employment, previous instances of harmful conduct by her, and the circumstances and severity of the misconduct under review in determining the likelihood of future misconduct and whether discipline less severe than termination would constitute a sufficient punishment and deterrent, the arbitrator determined that termination of her employment was too severe a punishment and that the plaintiff thus lacked just cause to terminate her employment. Instead, the arbitrator, as he was entitled to do under the unrestricted submission, determined that there were mitigating factors and that severe disciplinary action just short of termination of employment was warranted, and, accordingly, he determined that the plaintiff had just cause to suspend her without pay for one month and to issue her a final warning. The unrestricted submission was made to the arbitrator, not to this court.

The majority, under the facts and circumstances of this case, applies the general public policy concerning protection of patients from abuse to reverse the arbitrator's determination that a serious punishment less than termination of employment was appropriate under the specific circumstances of this case. As determined by the trial court, however, there is no established dominant public policy against an arbitrator who is acting pursuant to an unrestricted submission reinstating an employee whose employment was terminated for failure to report suspected abuse promptly. To conclude that the arbitrator's award violated the public policy of protecting nursing home patients from abuse would be to conclude that an employee's failure to report abuse timely is grounds for per se termination of employment, which is not our law. Additionally, the arbitrator did not violate any public policy by considering the mitigating

factors applicable to Spence set forth throughout this dissent. See *State* v. *New England Health Care Employees Union*, supra, 271 Conn. 139.

I thus cannot agree that it is proper for this court to apply any public policy exception to the arbitration award solely to increase Spence's punishment from a one month suspension without pay to a termination of her employment, especially in light of the arbitrator's thoughtful weighing of the factors to be considered in determining the award, including but not limited to the public policy relied on by the majority. See id., 138–39.

The majority's general invocation of the public policy relating to protection of patients from abuse as set forth previously has the unfortunate result of diminishing this court's respect for and deference to the private arbitration process, and it also results in an expansion of the public policy exception from its intended narrow application in these circumstances. Taken to its logical conclusion, the majority sets forth a rule that requires an employer to terminate the employment of any employee who does not report a suspicion of elder abuse immediately, without consideration of any mitigating factors or whether the employer itself would be in violation of any public policy. The implication of the majority position is that, in this case, the plaintiff's failure to terminate the employment of each of the employees who knew of the suspected abuse, but failed to report it, amounts also to a violation by the employer of the public policy against patient abuse. I thus conclude that the broad expansion of this narrow exception is unwarranted, and not in the interest of employers or employees in this health care sector. Therefore, I respectfully dissent.