******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

BURR ROAD OPERATING COMPANY II, LLC *v.*
NEW ENGLAND HEALTH CARE EMPLOYEES
UNION, DISTRICT 1199
(SC 19160)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and Robinson, Js.*

*Argued October 20, 2014—officially released May 5, 2015*

*Michael E. Passero*, for the appellant (defendant).

*Andrea C. Kramer*, for the appellee (plaintiff).

*Opinion*

ROBINSON, J. The sole issue in this certified appeal is whether an arbitration award reducing the termination of an employee of a skilled nursing facility to a one month unpaid suspension, as a consequence for a two day delay by that employee in reporting her suspicion that her supervisor might have abused a resident, violated a clearly discernible public policy against the delayed reporting of suspected abuse of nursing home residents. The defendant, New England Health Care Employees Union, District 1199, appeals, upon our grant of its petition for certification,[1] from the judgment of the Appellate Court reversing the judgment of the trial court granting its application to confirm, and denying the application of the plaintiff, Burr Road Operating Company II, LLC, to vacate an arbitration award that reinstated the grievant, Leoni Spence, to her employment as a certified nursing assistant at a skilled nursing facility operated by the plaintiff. *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, 142 Conn. App. 213, 234, 70 A.3d 42 (2013) (*Burr Road*). On appeal, the defendant claims that the Appellate Court improperly determined that the arbitration award reinstating the grievant's employment violated Connecticut's clear public policy requiring the prompt reporting of any incident of suspected abuse of a nursing home resident. Having conducted a thorough analysis of the four factors governing whether an arbitration award requiring the reinstatement of a terminated employee violates public policy, we conclude that the award in the present case did not violate this public policy. Accordingly, we reverse the judgment of the Appellate Court.

The opinion of Appellate Court, as supplemented by the record, reveals the following relevant facts and procedural history. The plaintiff operates a 120 bed skilled nursing facility known as the Westport Health Care Center (Westport). Id., 215. The grievant was employed there as a certified nursing assistant from 2002 until the termination of her employment in 2010, and is represented by the defendant. Id., 215–16.

Between 2005 and 2009, the grievant was the subject of three disciplinary actions that have remained part of her personnel file. Id., 216. In 2005, she received a suspension and final warning after she improperly restrained a resident by using a bed sheet to tie him into his wheelchair. Id. In April, 2009, she received a written warning for speaking to a resident in an inappropriately rude, loud, and scolding manner, and for being insubordinate and disrespectful to her shift supervisor, registered nurse Gay Muizulles. Id., 216–17. Finally, in August, 2009, the grievant received a " '[second] and [f]inal' "[2] written warning for addressing a resident disrespectfully and touching that resident without first explaining the procedure involved. Id., 216.

The incident that led to the termination of the grievant's employment transpired in March, 2010. Id. The grievant worked the night shift, which runs from 11 p.m. to 7 a.m., from the evening of Saturday, March 20, to the morning of Sunday, March 21. Id. She was assigned to work on Westport's " 'Riverside Unit' " (Riverside) that night, along with Dezra Leonard, a charge nurse. Id., 216–17. Muizulles was working on Westport's " 'Woodside Unit' " (Woodside) that night, together with Laurel Johnson, another certified nursing assistant. Id., 217. Sometime late in the shift, the grievant overheard Johnson telling Leonard about an incident that had transpired that night at Woodside. Id. The grievant understood, from what she had overheard, that a Woodside resident had been crying. Id. The grievant also heard Johnson state something to the effect of, " '[i]f the supervisor wasn't so rude, I would have picked up more residents,' " or, " '[t]hat's what [Muizulles] gets, for not calling Kim.' "[3] Id. When the grievant approached Johnson and Leonard and asked them who had been crying, Leonard did not respond, and Johnson indicated that she would talk with the grievant later. Id. The grievant and Johnson did not, however, have an opportunity to talk further before their shifts ended. Id.

On the basis of the conversation she overheard, the grievant concluded that Muizulles had been involved in an incident in which a resident had been crying. Id. Although the grievant could not be certain, she also believed that the incident might have involved abuse. Id. Before her shift ended, the grievant went to Woodside " 'to snoop' " around and investigate. Id. The residents were all asleep, however, and no one was crying. Id.

According to the arbitration report, the grievant did not report her suspicions at that time because, in her words, " 'I didn't know for sure that there had been abuse . . . . I wasn't sure what had happened.' " There also is no indication that she pursued the matter the following night shift, from Sunday, March 21, to Monday, March 22, when she again worked on Riverside with Muizulles. *Burr Road*, supra, 142 Conn. App. 217.

The first shift that the grievant worked on Woodside after the suspected incident was the next night, from Monday, March 22, to Tuesday, March 23. Id. During that shift, she had occasion to speak with a resident of Woodside, who told the grievant that, on the previous Saturday night, Muizulles had been somewhat rough while helping her get her legs up onto her bed, had spoken gruffly, and had turned down the television without asking permission. Id. The resident's roommate confirmed that these events had upset the resident, who had cried for some time afterward. Id., 217–18.

The grievant realized that this was likely the incident she had overheard Johnson and Leonard discussing

during the Saturday night shift. Id., 218. The grievant comforted the resident, explained to her that she should not have been subjected to such treatment, and informed her that she should feel comfortable reporting it. Id. The grievant suggested that she could arrange for someone to come and speak to the resident about what had happened to her, and the resident agreed. Id.

After her shift ended on Tuesday morning, the grievant went home and tried to call a social worker at Westport. Id. The social worker was not available, however, so the grievant left her three lengthy voice mail messages reporting what the resident had told her and urging the social worker to talk to the resident. Id.

The plaintiff subsequently carried out a thorough investigation of Muizulles' treatment of the resident. Id. Its ultimate conclusion was that Muizulles had acted insensitively, but that her treatment had not risen to the level of resident abuse or neglect. Id. In light of Muizulles' twenty years of employment, with no prior discipline on her record, the plaintiff gave her a five day suspension and a final warning. Id.

During its investigation of Muizulles, the plaintiff also concluded that three staff members—Johnson, the grievant, and the assistant director of nursing, whom the social worker had notified of the suspected abuse— had failed to fulfill their obligations promptly to report Muizulles' possible abuse. Id. Johnson received a final warning and a two day suspension for failing to report a complaint made by a resident regarding possible abuse by another staff member. Id. The assistant director of nursing also was suspended because, after she was informed by the social worker of the possible abuse, the assistant director of nursing failed to notify Westport's director of nursing or another administrator immediately. Id., 218–19. There is no indication in the record that Leonard was ever disciplined for her failure to report what Johnson had told her.

By contrast, the plaintiff terminated the grievant's employment on the ground that she had failed to make a timely report of an allegation of resident abuse. Id., 219. It subjected her to more serious discipline than Muizulles, Johnson, and the assistant director of nursing because, unlike those employees, the grievant already had a final warning in her employee file. Prior to terminating the grievant's employment, the plaintiff never informed her that she was under investigation, nor afforded her any opportunity to tell her side of the story or to explain or to clarify why she did not immediately report her suspicions after her shift had ended on Sunday morning. Id., 233–34. "This most rudimentary due process," the arbitrator remarked, "was not afforded to the grievant."

The grievant grieved her termination, and the defendant took the termination to arbitration pursuant to the

collective bargaining agreement between the parties. The parties asked the arbitrator to determine: (1) whether the grievant had been terminated for just cause; and (2) if not, what the remedy should be.

The arbitrator agreed with the plaintiff that the grievant improperly had delayed reporting an incident of suspected resident abuse. Specifically, the arbitrator found that the grievant: (1) was aware, based on training she had received and simple common sense, that she was required to report immediately any information regarding suspected resident abuse to a nursing supervisor or more senior administrator, regardless of the source of that information; (2) came to believe in the early hours on Sunday, March 21,[4] that Muizulles might have committed resident abuse, but waited more than two days, until her shift ended on Tuesday morning, March 23, to report her suspicion; and (3) reported her suspicion "imperfect[ly]," by leaving telephone messages for Westport's social worker, instead of reporting directly to someone in the proper line of authority.[5] On the basis of these findings, the arbitrator concluded that "the grievant was guilty of the offense of failing to timely report to a nursing supervisor (or higher authority) the information that had come into her possession . . . ."

In determining whether the plaintiff had just cause to terminate the grievant for this offense, the arbitrator recognized that a health care provider "is under [a] clear, statutory obligation to report immediately to the state regulatory body whenever there has been an event of possible resident abuse," which "obligation only can be fulfilled if employees report in a timely manner. Moreover, and more fundamentally, any delay in reporting by a staff member leaves the residents at risk of possible further abuse by the alleged perpetrator; corrective action by [the administrators] to assure resident well-being inevitably is delayed if reporting by staff is delayed." For that reason, the arbitrator credited the plaintiff's argument that "a delay in reporting is almost as bad as not reporting at all."

The arbitrator also concluded, however, that it was "an important mitigating fact that the grievant was the one who actually came forward, although belatedly, and made [the plaintiff] aware of the problem. If the grievant had not come forward on March 23, it is quite likely that [the plaintiff] never would have learned of the insensitive treatment given by Muizulles, nor of the failure to report by multiple staff members. It is important to recognize that contribution which the grievant made, then, albeit belatedly, to help assure the well-being of the residents . . . ." For that reason, the arbitrator recognized that "the grievant's misconduct arguably was much less egregious than the misconduct of the others involved," who "apparently had no intention of making any report."[6]

Ultimately, the arbitrator found as follows: "The grievant did fail to make a timely report of what she had learned on March 20.[7] She knew the rule that she had to report, and to do so without delay. She failed to fulfill that responsibility in a timely manner. And, she had a poor disciplinary record, so that placed her in a worse position than the other staff members involved . . . . On the other hand, there is the significant mitigating factor that it was the grievant, not the others, who did come forward and report to [the plaintiff], although belatedly; and it was her reporting [that] allowed [the plaintiff] to take corrective actions." (Footnote added.) Accordingly, the arbitrator concluded that the plaintiff lacked just cause to terminate the grievant's employment. Instead, the arbitrator interpreted the parties' collective bargaining agreement to mean that "severe disciplinary action just short of termination was warranted." The arbitrator therefore determined that the plaintiff had just cause to suspend the grievant without pay for one month and to issue her a final warning and, accordingly, he ordered the grievant reinstated.

The plaintiff filed an application to vacate the arbitration award on the grounds that: (1) the award violated Connecticut's clear public policy of protecting residents in health care facilities from abuse; and (2) the arbitrator exceeded his powers under the collective bargaining agreement and refused to hear pertinent evidence. The defendant filed an application to confirm the award. The trial court rejected the plaintiff's public policy argument based on the limited scope of judicial review over arbitration decisions, as well as the lack of clear authority requiring a nursing home employee to be terminated, rather than disciplined in some other way, for this type of misconduct. The trial court also determined that, because the award answered the submitted questions, the arbitrator did not exceed the scope of his authority. Accordingly, the trial court rendered judgment denying the plaintiff's application to vacate and granting the defendant's application to confirm the award.

The plaintiff appealed from the judgment of the trial court to the Appellate Court on both grounds. With respect to the public policy claim, the Appellate Court reversed, concluding that the arbitration award violated a well-defined public policy against delayed reporting of suspected abuse of vulnerable nursing home residents.[8] *Burr Road*, supra, 142 Conn. App. 215. Specifically, the court concluded that, in light of her past record of misconduct and her failure to report promptly and through the proper channels, the grievant had demonstrated an "inability to meet the demands of the public policy of protection and reporting." Id., 226; see id., 226 n.6. Because the Appellate Court reversed the judgment of the trial court with respect to the first claim, it declined to reach the plaintiff's second claim on appeal,

namely, that the arbitrator had exceeded his authority. Id., 215. This certified appeal followed. See footnote 1 of this opinion. Additional facts will be set forth as necessary.

On appeal, the defendant argues that there is no basis for the Appellate Court's conclusion that an employee who delays reporting suspected abuse *must* be terminated in order to protect vulnerable nursing home residents, and that, in concluding to the contrary, the Appellate Court improperly relied on its own fact-finding, which exceeded the scope of, and was unsupported by, the arbitration award. Specifically, the defendant contends that there is no basis in the record for the Appellate Court's conclusion that the grievant's delay in reporting her suspicions was *related* to her prior disciplinary infractions, and, therefore, that she likely would be unable to meet the demands of public policy if reinstated. In response, the plaintiff contends that termination of an employee such as the grievant, with a documented history of resident abuse, is necessary in order to ensure resident safety, and that the Appellate Court properly relied on the facts found by the arbitrator and conclusions reasonably to be drawn therefrom. We agree with the defendant, and conclude that none of the factors we have previously considered when reviewing public policy challenges to arbitration awards reinstating terminated employees militate in favor of vacating the award in the present case.

We begin our analysis with the applicable standard of review. "[W]e favor arbitration as a means of settling private disputes, [thus] we undertake judicial review of arbitration awards in a manner designed to minimize interference with an efficient and economical system of alternative dispute resolution. . . . We will, however, submit to higher scrutiny an arbitration award that is claimed to be in contravention of public policy. . . . [P]arties cannot expect an arbitration award approving conduct which is . . . contrary to public policy to receive judicial endorsement any more than parties can expect a court to enforce such a contract between them. . . . When a challenge to the arbitrator's authority is made on public policy grounds, however, *the court is not concerned with the correctness of the arbitrator's decision but with the lawfulness of enforcing the award.* . . .

"Thus, when a party challenges a consensual arbitral award on the ground that it violates public policy, and where that challenge has a legitimate, colorable basis, de novo review of the award is appropriate in order to determine whether the award does in fact violate public policy. . . . As this court maintained in [*State* v. *AFSCME, Council 4, Local 391*, 309 Conn. 519, 528, 69 A.3d 927 (2013)], we defer to the arbitrator's interpretation of the agreements regarding the scope of the [contract] provision . . . . We conclude only that as a

reviewing court, we must determine, pursuant to our plenary authority and giving appropriate deference to the arbitrator's factual conclusions, whether the contract provision in question violates those policies." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Stratford* v. *AFSCME, Council 15, Local 407*, 315 Conn. 49, 55–56, 105 A.3d 148 (2014).

To determine whether an arbitration award must be vacated for violating public policy, we employ a two-pronged analysis. See id., 56. First, we must determine whether the award implicates any explicit, well-defined, and dominant public policy. See id. To identify the existence of a public policy, we look to statutes, regulations, administrative decisions, and case law. See id. Second, if the decision of the arbitrator does implicate a clearly defined public policy, we then determine whether the contract, as construed by the arbitration award, violates that policy. See id.

In the present case, with regard to the first prong of the analysis, neither party actively challenges the Appellate Court's conclusion that Connecticut has a clear, well-defined, and dominant public policy of protecting vulnerable residents in skilled nursing facilities from abuse, and that this policy encompasses the prompt reporting of any incidents of suspected abuse. See *Burr Road*, supra, 142 Conn. App. 224. Accordingly, the sole issue before us is whether, under the circumstances of the present case, an arbitration award of a one month unpaid suspension and final warning, rather than termination of the grievant, violates that public policy.[9] "In making this determination, we are mindful that the fact that an employee's misconduct implicates public policy does not require the arbitrator to defer to the employer's chosen form of discipline for such misconduct." (Internal quotation marks omitted.) *Stratford* v. *AFSCME, Council 15, Local 407*, supra, 315 Conn. 58. Rather, a party seeking to vacate an arbitration award reinstating a terminated employee "bears the burden of proving that illegality or conflict with public policy is clearly demonstrated"; (internal quotation marks omitted) *State* v. *New England Health Care Employees Union, District 1199, AFL-CIO*, 271 Conn. 127, 136, 855 A.2d 964 (2004); and that "nothing less than the termination of [the grievant's] employment" will suffice to vindicate the public policy at issue. (Internal quotation marks omitted.) *Stratford* v. *AFSCME, Council 15, Local 407*, supra, 59. "It bears emphasizing, moreover, that implicit in the stringent and narrow confines of this exception to the rule of deference to arbitrators' determinations, is the notion that the exception must not be interpreted so broadly as to swallow the rule." (Internal quotation marks omitted.) *State* v. *New England Health Care Employees Union, District 1199, AFL-CIO*, supra, 271 Conn. 136.

I

GENERAL PRINCIPLES

Since this court first recognized the public policy exception to the general rule of deference to an arbitration award made pursuant to an unrestricted submission; see *Board of Trustees* v. *Federation of Technical College Teachers*, 179 Conn. 184, 195, 425 A.2d 1247 (1979); we have decided one half dozen cases in which an employer sought to vacate on public policy grounds an award reinstating an employee who had been terminated for misconduct.[10] In one half of those cases, we held that reinstatement of the terminated employee violated a clear public policy of the state. See *State* v. *AFSCME, Council 4, Local 391*, supra, 309 Conn. 521 (correction officer engaged in persistent sexual harassment of coworkers); *Groton* v. *United Steelworkers of America*, 254 Conn. 35, 36–37, 757 A.2d 501 (2000) (weighmaster at municipal landfill pleaded nolo contendere to embezzlement charge); *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, 252 Conn. 467, 468–69, 747 A.2d 480 (2000) (correction officer placed obscene, racist telephone call to state senator). In the other three cases, we upheld the decision of the arbitrator reinstating the terminated employee. See *Stratford* v. *AFSCME, Council 15, Local 407*, supra, 315 Conn. 50–52 (police officer misrepresented history of alcohol use during official medical exam); *State* v. *New England Health Care Employees Union, District 1199, AFL-CIO*, supra, 271 Conn. 129–31 (Department of Mental Retardation[11] employee shoved agitated client into chair); *South Windsor* v. *South Windsor Police Union Local 1480, Council 15*, 255 Conn. 800, 802–805, 770 A.2d 14 (2001) (police officer deemed unfit for duty after drawing gun on trespassers playing basketball in school gym). This has, moreover, been an area of the law in which consensus has proved elusive. See *Stratford* v. *AFSCME, Council 15, Local 407*, supra, 62 (dissenting opinion authored by Justice Palmer and joined by Justice Espinosa); *State* v. *AFSCME, Council 4, Local 391*, supra, 542 (dissenting opinion authored by Justice Eveleigh); *State* v. *New England Health Care Employees Union, District 1199, AFL-CIO*, supra, 145 (opinion dissenting in part authored by Justice Zarella); *Groton* v. *United Steelworkers of America*, supra, 53 (dissenting opinion authored by Justice Katz and joined by Justices Norcott and Palmer); see also *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, supra, 478 (opinion by Justice Peters concurring in result reached by majority).

Accordingly, to assure consistent, principled decision making in cases of this nature, we take this opportunity to clarify the factors a reviewing court should consider when evaluating a claim that an arbitration award reinstating a terminated employee violates public policy, and, by extension, the types of factual findings an arbitrator may make in order to assist a reviewing court in considering such a challenge. Specifically, in

determining whether termination of employment was necessary to vindicate the public policies at issue, both the majority and the dissenting opinions of this court have, either expressly or implicitly, focused on four principal factors: (1) any guidance offered by the relevant statutes, regulations, and other embodiments of the public policy at issue; (2) whether the employment at issue implicates public safety or the public trust; (3) the relative egregiousness of the grievant's conduct; and (4) whether the grievant is incorrigible.[12] See, e.g., *State* v. *AFSCME, Council 4, Local 391*, supra, 309 Conn. 538–41. In the remainder of this part of the opinion, we discuss each of those factors, and clarify the extent to which the factual findings of the arbitrator control or affect the reviewing court's analysis under each factor. In part II of this opinion, we consider each factor as applied to the present appeal.

A

The first factor requires us to consider whether the relevant statutes, regulations, and other manifestations of the public policy at issue themselves recommend or require termination of employment as the sole acceptable remedy for a violation thereof. See id., 540–41; *South Windsor* v. *South Windsor Police Union Local 1480, Council 15*, supra, 255 Conn. 823; *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, supra, 252 Conn. 477; accord *Eastern Associated Coal Corp.* v. *United Mine Workers of America District 17*, 531 U.S. 57, 66, 121 S. Ct. 462, 148 L. Ed. 2d 354 (2000) (relying on fact that reinstatement order did not violate "specific provision of any law or regulation"). Put differently, we ask whether the offense committed by the employee involves the sort of conduct the law deems to be inexpiable, or that would expose the employer to substantial liability if it were to reoccur. See *State* v. *AFSCME, Council 4, Local 391*, supra, 309 Conn. 549–50 (*Eveleigh, J.*, dissenting). Whether sources of public policy themselves mandate termination is a question of law subject to plenary review. See id., 528–29; *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, supra, 475–76.

B

The second factor we consider is whether the nature of the employment at issue implicates public safety or the public trust. See, e.g., *Stratford* v. *AFSCME, Council 15, Local 407*, supra, 315 Conn. 68–71 (*Palmer, J.*, dissenting) (community places special public trust in police officers, who are granted broad authority and wide discretion in maintaining law and order); *Groton* v. *United Steelworkers of America*, supra, 254 Conn. 48–49 (employer should not be required to retain employee established to have stolen public funds while in position of financial trust); *Board of Police Commissioners* v. *Stanley*, 92 Conn. App. 723, 741–42, 887 A.2d 394 (2005) (collecting cases). Nationally, in the vast

majority of cases in which courts have vacated for public policy reasons arbitration awards reinstating terminated employees, the grievant has been a public sector employee, primarily working in fields such as law enforcement, education, transportation, and health care, in other words, fields that cater to vulnerable populations or help ensure the public safety. See generally annot., 112 A.L.R.5th 263 (2003 and Supp. 2013); see also A. Hodges, "Judicial Review of Arbitration Awards on Public Policy Grounds: Lessons from the Case Law," 16 Ohio St. J. on Disp. Resol. 91, 114–20 (2000). This reflects the fact that the threat to public policy involved in reinstating a terminated employee is magnified when the offending employee provides an essential public service, and especially when he is employed by, represents, and, ultimately, is answerable to the people. See generally *Brooklyn Center* v. *Law Enforcement Labor Services, Inc.*, 635 N.W.2d 236, 244 (Minn. App. 2001) (because police are held out as deserving of public trust and have unique opportunities to exploit that trust, municipality has special duty not to employ abusive officer). In most private sector disputes, by contrast, the law presumes that the parties have secured their own interests through their contractual arrangements, including the agreement to submit any disputes to binding arbitration; see J. Gordon, "Common Enterprise and Multiple Investors: A Contractual Theory for Defining Investment Contracts and Notes," 1988 Colum. Bus. L. Rev. 635, 667–68 (1988); and that the customers or clients whom they serve may vote with their feet and protect their own interests should they deem the conduct of an employee to be unacceptable. See A. Eisenberg, "When HMO Patients Can't Get No Satisfaction," 4 DePaul J. Health Care L. 367, 377 (2001).

When courts have barred the reinstatement of private sector employees, those employees typically have worked in fields in which the misconduct involved could lead to disastrous consequences not only for their employer's customers but also for the public at large. See *Stead Motors of Walnut Creek* v. *Automotive Machinists Lodge No. 1173, International Assn. of Machinists & Aerospace Workers*, 886 F.2d 1200, 1214 (9th Cir. 1989) (*Stead Motors*), cert. denied, 495 U.S. 946, 110 S. Ct. 2205, 109 L. Ed. 2d 531 (1990); see also *Delta Air Lines, Inc.* v. *Air Line Pilots Assn., International*, 861 F.2d 665, 672 (11th Cir. 1988) (intoxicated commercial airline pilot), cert. denied, 493 U.S. 871, 110 S. Ct. 201, 107 L. Ed. 2d 154 (1989); *Iowa Electric Light & Power Co.* v. *Local Union 204 of International Brotherhood of Electric Workers (AFL-CIO)*, 834 F.2d 1424, 1426 (8th Cir. 1987) (nuclear power plant machinist intentionally violated federally mandated secondary containment rules); *Amalgamated Meat Cutters & Butcher Workmen of North America AFL-CIO, Local Union 540* v. *Great Western Food Co.*, 712 F.2d 122,

124 (5th Cir. 1983) ("[a truck] driver who imbibes the spirits endangers not only his own life, but the health and safety of all other drivers"); *Black* v. *Cutter Laboratories*, 43 Cal. 2d 788, 807, 278 P.2d 905 (1955) (potential terrorist working in private plant producing military and civilian antibiotics), cert. dismissed, 351 U.S. 292, 76 S. Ct. 824, 100 L. Ed. 1188 (1956).

In Connecticut, in every case wherein this court has concluded that an arbitration award reinstating a terminated employee offended public policy, the grievant was a state or municipal employee. See *State* v. *AFSCME, Council 4, Local 391*, supra, 309 Conn. 519 (correction officer); *Groton* v. *United Steelworkers of America*, supra, 254 Conn. 35 (weighmaster at municipal landfill); *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, supra, 252 Conn. 467 (correction officer). In *State* v. *AFSCME, Council 4, Local 391*, supra, 538, for example, in upholding the vacatur of the arbitration award, we emphasized that "the [grievant's offensive] conduct occurred in a prison in the presence of other employees and inmates, where the need for order, discipline and a culture of mutual respect among employees is particularly acute." This factor also hinges on general questions of law and policy and is, therefore, subject to plenary judicial review.

C

The third factor we consider is the relative "egregiousness" of the grievant's offense. See *Stratford* v. *AFSCME, Council 15, Local 407*, supra, 315 Conn. 61; *State* v. *AFSCME, Council 4, Local 391*, supra, 309 Conn. 534, 538; see also *Metropolitan District Commission* v. *Local 184, Council 4, AFSCME, AFL-CIO*, 77 Conn. App. 832, 845–46, 825 A.2d 218 (2003) (collecting cases). This factor encompasses myriad considerations, including, but not limited to: (1) the severity of the harms imposed and risks created by the grievant's conduct; (2) whether that conduct strikes at the core or falls on the periphery of the relevant public policy; (3) the intent of the grievant with respect to the offending conduct and the public policy at issue; (4) whether reinstating the grievant would send an unacceptable message to the public or to other employees regarding the conduct in question; (5) the potential impact of the grievant's conduct on customers/clients and other nonparties to the employment contract; (6) whether the misconduct occurred during the performance of official duties; and (7) whether the award reinstating the employee is founded on the arbitrator's determination that mitigating circumstances, or other policy considerations, counterbalance the public policy at issue. See *Stratford* v. *AFSCME, Council 15, Local 407*, supra, 59–60 and n.4; *State* v. *AFSCME, Council 4, Local 391*, supra, 538; *State* v. *New England Health Care Employees Union*, District 1199, AFL-CIO, supra, 271 Conn. 138–41; *Groton* v. *United Steelworkers of America*,

supra, 254 Conn. 48–49; *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, supra, 252 Conn. 477–78.

This factor presents a mixed question of law and fact. We take as our starting point the factual findings of the arbitrator, which are not subject to judicial review. See *State* v. *New England Health Care Employees Union, District 1199, AFL-CIO*, 265 Conn. 771, 778, 830 A.2d 729 (2003). We defer as well to the arbitrator's ultimate determination whether termination was a just or appropriate punishment for the conduct at issue. We also agree with the plaintiff, however, that, for purposes of the public policy analysis, our determination of whether the conduct in question was so egregious that any punishment short of termination would offend public policy is not restricted to those findings. See *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, supra, 252 Conn. 479 (*Peters, J.*, concurring); *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.*, 252 Conn. 416, 430, 747 A.2d 1017 (2000). A broader review is required because the arbitrator, in determining whether there was just cause or some other contractual basis for termination, may focus on case specific considerations such as how the employer has disciplined other employees under similar circumstances. Judicial review, by contrast, necessarily transcends the interests of the parties to the contract, and extends to the protection of other stakeholders and the public at large, who may be adversely impacted by the decision to reinstate the employee. See C. Fox & B. Gruhn, "Toward a Principled Public Policy Standard: Judicial Review of Arbitrators' Decisions," 1989 Det. C.L. Rev. 863, 867, 872, 896 (1989). Accordingly, we review de novo the question whether the remedy fashioned by the arbitrator is sufficient to vindicate the public policies at issue.

### D

The fourth factor we consider is whether the grievant is so "incorrigible" as to require termination. See *Stratford* v. *AFSCME, Council 15, Local 407*, supra, 315 Conn. 59; *State* v. *AFSCME, Council 4, Local 391*, supra, 309 Conn. 538. Put differently, in light of the grievant's full employment history, is there a substantial risk that, should a court uphold the arbitration award of reinstatement, this particular employee will reengage in the offending conduct? See *State* v. *New England Health Care Employees Union, District 1199, AFL-CIO*, supra, 271 Conn. 138–39, 141. Here, relevant considerations include whether, on the one hand, the grievant has committed similar offenses in the past and has disregarded an employer's prior warnings or clear policy statements; or, on the other hand, whether the grievant: (1) has generally performed his work in a competent and professional manner; (2) has demonstrated a willingness to change and an amenability to discipline; (3) has exhibited remorse and attempted to make restitution for past offenses; and (4) is likely to benefit from

additional training and guidance. See id., 138–41; see also *Stratford* v. *AFSCME, Council 15, Local 407*, supra, 59 and 61 n.6; *State* v. *AFSCME, Council 4, Local 391*, supra, 538; *State* v. *New England Health Care Employees Union, District 1199, AFL-CIO*, supra, 271 Conn. 149–50 (*Zarella, J.*, dissenting in part); *South Windsor* v. *South Windsor Police Union Local 1480, Council 15*, supra, 255 Conn. 821. We also consider whether the penalty imposed by the arbitrator is severe enough to deter future infractions by the grievant or others. See *Stratford* v. *AFSCME, Council 15, Local 407*, supra, 58–59.

Because these considerations are largely fact based and case specific, a reviewing court must defer to an arbitrator's assessment—whether express or implied—that a particular employee is unlikely to reoffend if reinstated. See *Stead Motors*, supra, 886 F.2d 1213; *Stratford* v. *AFSCME, Council 15, Local 407*, supra, 315 Conn. 61 n.6. Absent an express finding by the arbitrator, which would be unreviewable, a court will deem an employee incorrigible only when the likelihood of recidivism is plain from the face of the record. See, e.g., *State* v. *AFSCME, Council 4, Local 391*, supra, 309 Conn. 535–40 (concluding that grievant was incorrigible because he was aware of employer's zero tolerance policy but had, nevertheless, repeatedly and openly harassed complainant and others over substantial period of time, even after being asked to desist).

II

APPLICATION OF FACTORS TO THIS CASE

Turning to the record in the present case, we conclude that each of these four factors is either neutral or weighs against vacating the arbitration award before us. Accordingly, we conclude that the plaintiff has not met the heavy burden of demonstrating that reinstating the grievant clearly violates the public policy of Connecticut.

We first consider whether sources or manifestations of the relevant public policy indicate that the public policy can be vindicated only if all workplace violations thereof result in termination of the offender. Connecticut's well established public policies of protecting vulnerable residents who reside in skilled nursing facilities, and of promptly reporting any suspected abuse or neglect thereof, are embodied, respectively, in General Statutes §§ 19a-550 and 17b-451.[13] Both policies are further implemented in § 19-13-D8t of the Regulations of Connecticut State Agencies.

Section 19a-550, Connecticut's patients' bill of rights, provides in relevant part: "(b) There is established a patients' bill of rights for any person admitted as a patient to any nursing home facility, residential care home or chronic disease hospital. . . . The patients' bill of rights shall provide that each such patient . . .

(8) is free from mental and physical abuse, corporal punishment, involuntary seclusion and any physical or chemical restraints imposed for purposes of discipline or convenience . . . ." By way of remedy, the statute creates a private right of action for any patient so harmed; General Statutes § 19a-550 (e); and also entitles the patient to seek administrative relief from the Department of Social Services or the Department of Public Health. General Statutes § 19a-550 (b) (20). Notably, the patients' bill of rights does not provide for any particular penalty for offending nursing home employees.

Section 17b-451 mandates the prompt reporting of suspected abuse. Subsection (a) of § 17b-451 provides in relevant part that "any registered nurse, any nursing home administrator, nurse's aide or . . . staff person employed by a nursing home facility . . . who has reasonable cause to suspect or believe that any elderly person has been abused, neglected, exploited or abandoned . . . shall, not later than seventy-two hours after such suspicion or belief arose, report such information or cause a report to be made in any reasonable manner to the Commissioner of Social Services or to the person or persons designated by the commissioner to receive such reports. Any person required to report under the provisions of this section who fails to make such report within the prescribed time period shall be fined not more than five hundred dollars, except that, if such person intentionally fails to make such report within the prescribed time period, such person shall be guilty of a class C misdemeanor for the first offense and a class A misdemeanor for any subsequent offense." The plaintiff suggests that, because the statute provides only seventy-two hours for its administrators to report cases of suspected abuse to the Commissioner of Social Services, to facilitate statutory compliance Westport must in turn require that its nursing staff immediately report any such suspicions to their superiors.

Whether the plaintiff was warranted in establishing and strictly enforcing prompt internal reporting requirements, however, goes to the substance of the arbitrator's determination that the plaintiff lacked just cause for terminating the grievant, the merits of which are not at issue in this certified appeal. The question we must resolve is not whether § 17b-451 mandates prompt internal reporting by nursing home employees, but, rather, whether the statute evidences a determination by the legislature that one who fails to timely report suspected abuse of nursing home residents is, ipso facto, unfit for continued employment in such a facility. We perceive no such legislative intent. The statute clearly provides that a person whose failure to timely report is inadvertent—as the grievant's arguably was, and as Westport's surely would have been until the grievant belatedly reported her suspicions—is subject only to a maximum fine of $500. More importantly,

the statute provides that one who intentionally fails to timely report is guilty of a class A misdemeanor for "any subsequent offense." General Statutes § 17b-451 (a). In other words, the legislature envisioned that a health care worker might be permitted to remain in her position even after having repeatedly and intentionally violated the provisions of the statute.

Rules intended to protect the residents of nursing homes from abuse and neglect are further specified in § 19-13-D8t of the Regulations of Connecticut State Agencies. The regulations require immediate telephone reporting to the Department of Public Health of any complaint of patient abuse, to be followed by a written report within seventy-two hours. Regs., Conn. State Agencies § 19-13-D8t (g). Although the regulations expressly provide that a facility's medical director has the responsibility to "suspend or terminate the facility privileges of a medical staff member [who] is unable or unwilling to adequately care for a patient in accordance with . . . statutes and regulations . . . or facility by-laws"; id., § 19-13-D8t (h) (2) (H); no such provision is made for members of a *nursing* staff who either perpetrate or fail promptly to report patient abuse or neglect. Instead, the regulations simply require that facility administrators make "[a] determination . . . as to what preventative measures shall be implemented" in such cases; id., § 19-13-D8t (g) (5); and that the Department of Public Health maintain a registry of nursing aides that records, inter alia, any final determination by the Department of Public Health that an aide has engaged in resident abuse or neglect. Id., § 19-13-D8t (*l*) (2). As with the governing statutes, then, we read the Department of Public Health regulations to mean that a nursing facility is not required to terminate a health care worker who has failed to report an incident of resident abuse in order adequately to protect its residents.

We next consider the second factor, namely, whether reinstatement of the grievant would compromise public safety or violate the public trust. The plaintiff is a private limited liability company, and there is no indication in the record that Westport is anything other than a private, for-profit nursing home. As we previously have noted herein, it is the rare case in which a court will vacate on public policy grounds an arbitration decision reinstating a private sector employee who has been unjustly terminated. Nor is this a case like *Delta Air Lines, Inc.* v. *Air Line Pilots Assn., International,* supra, 861 F.2d 665, in which reinstatement of the grievant could by itself pose a serious threat to public safety.

We acknowledge, however, that residential nursing facilities do represent something of an exceptional case relative to other private sector employers. Nursing home residnts may lack the physical, mental, or financial wherewithal to leave an unsafe or undesirable facil-

ity. The state, in its traditional role as parens patriae, or parent of the nation, has an established interest in protecting its most vulnerable citizens, which extends to adult residents of skilled nursing facilities. Cf. *Connecticut* v. *Physicians Health Services of Connecticut, Inc.*, 103 F. Supp. 2d 495, 505 (D. Conn. 2000) (discussing cases involving group home residents), aff'd, 287 F.3d 110 (2d Cir.), cert. denied, 537 U.S. 878, 123 S. Ct. 77, 154 L. Ed. 2d 133 (2002); *Support Ministries for Persons with AIDS, Inc.* v. *Waterford*, 799 F. Supp. 272, 277 (N.D.N.Y. 1992) (state's "quasi-sovereign interest in the health and well-being of its citizens" extends to residential care facility for patients with AIDS). Moreover, many patients in private nursing facilities may be the beneficiaries of Medicaid or other public funding sources, so that the financial transactions involved are not purely private. Indeed, whether a medical facility is publicly or privately owned and operated may be indiscernible to the average patient. Consistent with these principles, courts from other jurisdictions considering whether to vacate, for public policy reasons, arbitration awards reinstating nurses and nursing assistants have done so by reference to the other factors discussed in this opinion, without expressly distinguishing public from private facilities. Accordingly, we conclude that this factor is neutral with respect to vacating the arbitration award.

We next consider the third factor, namely, whether the grievant's conduct was so egregious that no disciplinary measure short of termination will vindicate the relevant public policies. We begin by observing that the grievant's misconduct in the present case falls at the periphery of the ultimate public policy concern—protecting vulnerable nursing home residents from abuse and neglect. The grievant did not actually abuse any residents. Rather, she merely delayed reporting a second-hand conversation she had overheard simply suggesting that someone else *might* have committed abuse, and only delayed reporting for a few days. There is no indication in the record that any resident came to harm as a result of her delay, or that the plaintiff suffered any adverse legal consequences. In fact, the plaintiff itself ultimately determined that the incident in question did *not* constitute abuse. Most significantly, the arbitrator did not find that the grievant intentionally chose to neglect her reporting duties or to place residents at risk.

To the contrary, the arbitrator found, as a significant mitigating factor, that it was *only* the grievant who actually came forward, albeit belatedly, and made the plaintiff aware of the problem. In this act, she distinguished herself from Johnson and Leonard, who were the original source of the grievant's suspicions, and from the Westport administrator, to whom she was obliged to report.[14] The arbitrator thus found that, but for the grievant's contribution, Muizulles' insensitive treatment of the resident at Woodside quite likely never

would have come to light, and, therefore, that "the grievant's misconduct arguably was much less egregious than the misconduct of the others involved." Although he did not expressly identify them as mitigating factors, the arbitrator also found that the grievant: (1) actively and promptly investigated the possible abuse on her own initiative; (2) comforted and counseled the resident upon learning of the incident with Muizulles; and (3) left multiple, lengthy messages for the social worker that same day, urging her to speak with the resident about the incident. There is abundant evidence in the record, then, to support the conclusion that, although the grievant acted improperly in delaying reporting her suspicions and failing to report through the proper channels, her conduct was devoid of insidious motives.[15]

Our review of the case law from both Connecticut and other jurisdictions confirms our conclusion that the grievant's conduct was not so egregious as to render her reinstatement a violation of public policy. In *State* v. *New England Health Care Employees Union, District 1199, AFL-CIO*, supra, 271 Conn. 127, we considered a public policy challenge to an arbitration award reinstating an employee found to have physically abused a blind and mentally handicapped resident of a training school. The grievant in that case had deliberately shoved the agitated resident into a chair, in violation of facility policy, resulting in a laceration to the resident's arm. Id., 131. In holding that a thirty day disciplinary suspension was adequate to vindicate the public policy against abuse of Department of Mental Retardation[16] clients, we observed that there was no evidence of intent to harm the resident, the magnitude of the harm was minimal, and the conduct itself was not criminal in nature. Id., 138–42. The same can be said of the present case, which did not implicate actual resident abuse.

Outside of Connecticut, a number of our sister courts have rejected public policy challenges to the reinstatement of nurses or nursing assistants, even in cases in which the conduct at issue was more egregious, and the risk to patient safety more pronounced, than in the present case. See, e.g., *Boston Medical Center* v. *Service Employees International Union, Local 285*, 260 F.3d 16, 25–26 (1st Cir. 2001) (upholding arbitration award reinstating nurse whose clinical misjudgments resulted in death of septic infant), cert. denied, 534 U.S. 1083, 122 S. Ct. 816, 151 L. Ed. 2d 700 (2002); *MidMichigan Regional Medical Center–Clare* v. *Professional Employees Division of Local 79, Service Employee International Union, AFL-CIO*, 183 F.3d 497, 504 (6th Cir. 1999) (reasoning that "[e]ven highly skilled professionals err on occasion" and concluding that reinstatement of intensive care nurse who had twice tried to administer improper medication and once negligently operated cardiac defibrillator did not offend public pol-

icy); *Maggio* v. *Local 1199*, 702 F. Supp. 989, 991, 996 (E.D.N.Y.) (upholding reinstatement of nurse's aide whom arbitrator found to have inadvertently mistreated two elderly patients), aff'd, 880 F.2d 1319 (2d Cir.), cert. denied, 493 U.S. 936, 110 S. Ct. 329, 107 L. Ed. 2d 319 (1989); *Brigham & Women's Hospital* v. *Massachusetts Nurses Assn.*, 684 F. Supp. 1120, 1121, 1125 (D. Mass. 1988) (upholding award reinstating nurse with history of five disciplinary incidents, including improper administration of medication, refusal to follow orders, and failure to notify physician of medical emergency); *Teamsters Union Local No. 2, International Brotherhood of Teamsters* v. *C.N.H. Acquisitions, Inc.*, 350 Mont. 18, 23–24, 204 P.3d 733 (2009) (fact that nurse might have placed vulnerable patients at risk did not mean that reinstatement would violate public policy).

By the same token, in the cases in which courts have vacated arbitration awards reinstating terminated nursing professionals, including those cited by the plaintiff, the conduct at issue was objectively more dangerous than that of the grievant in the present case. See, e.g., *Russell Memorial Hospital Assn.* v. *United Steelworkers of America*, 720 F. Supp. 583, 584, 587 (E.D. Mich. 1989) (arbitrator found that nurse had "a propensity for misconduct" and that her repeated insubordination and negligent failure to administer medication were " 'extremely serious' "); *Illinois Nurses Assn.* v. *Board of Trustees of University of Illinois*, 318 Ill. App. 3d 519, 530–32, 741 N.E.2d 1014 (critical care nurse failed timely to order and administer medication, charted that she had administered medication when she had not, failed to chart or report pacemaker malfunction, and had long history of inattentive work attitude and below average nursing skills), appeal denied, 194 Ill. 2d 567, 747 N.E.2d 352 (2001). Accordingly, we conclude that the egregiousness factor does not support vacating the arbitration award in the present case on public policy grounds.

Lastly, we consider the fourth factor, namely, whether the grievant is so incorrigible as to require termination. As previously noted, this is a factual question, for which we defer to the findings of the arbitrator. In the present case, the arbitrator did not find that the grievant was likely to reoffend if reinstated. Rather, the fact that he ordered her reinstated to a position of direct patient care strongly suggests that the arbitrator discounted the likelihood of recidivism, and that he deemed a one month unpaid suspension to be a sufficiently severe punishment to deter any future misconduct of this sort. See *Illinois Nurses Assn.* v. *Board of Trustees of University of Illinois*, supra, 318 Ill. App. 3d 532. Nothing in the record leads us to gainsay that conclusion. Accordingly, this factor also weighs against vacating the decision of the arbitrator.

The Appellate Court majority, in concluding other-

wise, improperly substituted its judgment for that of the arbitrator. That court reasoned that reinstatement of the grievant would place "the residents [of Westport] at risk of possible further abuse," because her "prior record of *related* disciplinary actions and two prior final warnings demonstrated her inability to meet the demands of . . . public policy . . . ." (Emphasis added.) *Burr Road*, supra, 142 Conn. App. 226–27. The Appellate Court further opined that the grievant had "a history of three incidents of *similar* misconduct, including two prior final warnings, within a period of five years." (Emphasis added.) Id., 229. That court's analysis, then, was founded on the premise that the grievant had engaged in a pattern of related misconduct, despite having twice received final warnings and, therefore, that she could be expected to offend again if reinstated.

The arbitrator, however, never found that the grievant's delay in reporting *Muizulles'* possible abuse was in any way related or similar to *the grievant's* prior incidents of resident abuse and insubordination. The incident for which the grievant was terminated was not one in which she personally engaged in physically or verbally abusive behavior, or even in which she attempted to cover-up or delay reporting abuse in which she had been involved. Rather, she merely overheard a conversation suggesting that her supervisor might possibly have made a resident cry. Her transgression in this instance was not rudeness, heavy-handedness, or insubordination. Nor did she exhibit indifference to the needs and suffering of the residents for whom she cared. To the contrary, upon learning that abuse might have taken place, she immediately set about trying to investigate it and, when she learned the truth, she offered the resident her compassionate support and assistance. The grievant's misstep, rather, was that she went about helping in the wrong way. She failed to follow proper protocol, which required that she immediately report her suspicions to a Westport administrator, who was better situated than she to conduct a prompt and thorough investigation and to comply with the relevant legal requirements. The grievant made a serious mistake in this respect, but the arbitrator did not find that she had made such a mistake before. There is nothing in the record to suggest that either: (1) after receiving a one month unpaid suspension, the grievant is likely to repeat this error in the future; or (2) her failure to timely and properly report her suspicions bespeaks any ongoing proclivity toward resident abuse. Accordingly, the arbitrator's implicit finding that the grievant was not incorrigible was not clearly erroneous.

Lastly, we reject the plaintiff's contention that termination was necessary because the grievant previously had received two "final" warnings. "[C]onsiderations of an employer's subjective policies, even a zero-tolerance policy . . . do not in any manner constitute public pol-

icy and are thus not relevant to our inquiry." (Internal quotation marks omitted.) *State* v. *AFSCME, Council 4, Local 391*, supra, 309 Conn. 531. The plaintiff is, of course, free to adopt any legal policy of employee discipline. When contracting with the defendant, the plaintiff could have held out for terms in the collective bargaining agreement that would allow it to terminate any employee who commits an infraction after having received a final warning, without the possibility of grievance or appeal. See id., 547–48, 556–57 (*Eveleigh, J.*, dissenting). It did not. Rather, both parties agreed that an arbitrator would ultimately determine the fairness and reasonableness of the plaintiff's disciplinary policies and actions. In this instance, the arbitrator concluded that strictly enforcing a final warning policy, under the circumstances, would be unjust. Having agreed to delegate that decision to the arbitrator, the plaintiff cannot now be heard to complain that it should not be required to give the grievant a second chance.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to consider the plaintiff's remaining claims on appeal.

In this opinion the other justices concurred.

* This case originally was scheduled to be argued before a panel of this court consisting of Chief Justice Rogers and Justices Palmer, Zarella, Eveleigh, McDonald, Espinosa and Robinson. Although Justice Robinson was not present when the case was argued before the court, he has read the record and briefs and listened to a recording of the oral argument prior to participating in this decision.

[1] We granted the defendant's petition for certification to appeal, limited to the following issue: "Did the Appellate Court properly determine that the trial court improperly confirmed the arbitration award because such award violated public policy?" *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, 309 Conn. 909, 68 A.3d 662 (2013).

[2] Although the arbitrator suggests that these notations had important significance under the collective bargaining agreement, that significance is not explained in the arbitration award.

[3] We note that, although the arbitrator's decision sets forth this quotation, it does not identify Kim or provide any further detail about that person's relationship to Muizulles or the present case.

[4] In his award, the arbitrator at times suggests that the grievant learned of the possible abuse on Saturday, March 20. However, in light of the arbitrator's finding that she overheard the conversation between Leonard and Johnson "later" in the night shift, which ran from 11 p.m. on March 20 to 7 a.m. on March 21, we presume that those events must have transpired sometime during the early morning hours of March 21.

[5] Because the person suspected of possible abuse was also her supervisor, the arbitrator concluded that the grievant was required to report the matter to someone else in the proper line of authority. Specifically, the arbitrator found that the grievant had other suitable options available, such as waiting to see the incoming day shift supervisor on the Sunday morning following her night shift, or calling Westport's director of nursing, its administrator, or any other nursing supervisor.

[6] In addition, the arbitrator reasoned that a nursing home operator should "not want to create a huge disincentive to reporting, if and when an employee for whatever reason has hesitated or delayed initially in reporting possible resident abuse. If the disciplinary approach is, once you have delayed you will be terminated even if you then make a belated report, then that creates a perverse incentive to never report. The belated reporter ends up being fired as the direct consequence of coming forward."

[7] See footnote 4 of this opinion.

[8] Judge Bear authored a dissenting opinion, in which he concluded, pursuant to *State* v. *New England Health Care Employees Union, District 1199*,

*ALF-CIO*, 271 Conn. 127, 855 A.2d 964 (2004), that the public policy at issue did not mandate termination of the grievant. *Burr Road*, supra, 142 Conn. App. 247. Judge Bear suggested that "[t]his case has a subtext of the age old response of unfair punishment of the bearer of bad tidings"; id., 237 n.3; and that the Appellate Court majority, in vacating the award, had "improperly and unnecessarily displac[ed] our courts' long-standing protection of the private arbitration process . . . ." Id., 243.

[9] For the purposes of this opinion, we take the public policy at issue to be the narrow one of prompt reporting of suspected abuse. See *South Windsor* v. *South Windsor Police Union, Local 1480*, 255 Conn. 800, 816, 770 A.2d 14 (2001). The outcome of our analysis would be no different, however, were we to consider the broader policy of protecting vulnerable residents in skilled nursing facilities from abuse.

[10] During that time, the Appellate Court has heard numerous additional appeals in which similar claims were presented. See, e.g., *Hartford* v. *Hartford Municipal Employees Assn.*, 134 Conn. App. 559, 39 A.3d 1146 (2012), cert. denied, 305 Conn. 904, 44 A.3d 180 (2012); *Board of Police Commissioners* v. *Stanley*, 92 Conn. App. 723, 887 A.2d 394 (2005); *Metropolitan District Commission* v. *Local 184, Council 4, AFSCME, AFL-CIO*, 77 Conn. App. 832, 825 A.2d 218 (2003); *South Windsor* v. *South Windsor Police Union*, 41 Conn. App. 649, 677 A.2d 464, cert. denied, 239 Conn. 926, 683 A.2d 22 (1996); *State* v. *Council 4, AFSCME*, 27 Conn. App. 635, 608 A.2d 718 (1992).

[11] In 2007, the Department of Mental Retardation was renamed the Department of Developmental Services. See Public Acts 2007, No. 07-73.

[12] By identifying these factors, we do not preclude the possibility that, in an exceptional case, other factors not enumerated herein might prove relevant or even dispositive.

[13] We note that §§ 19a-550 and 17b-451 have been amended by our legislature since the events underlying the present appeal. See, e.g., Public Acts 2013, No. 13-208, § 55; Public Acts 2013, No. 13-250, § 4. These amendments, however, have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of these statutes.

[14] Notably, the only Westport employee who appears to have properly reported the incident was the social worker in whom the grievant chose to confide.

[15] We are not persuaded by the plaintiff's contention that treating the grievant's belated reporting of her suspicions as a mitigating factor sends other employees the message that they have carte blanche to delay reporting suspected abuse so long as they eventually fulfill their reporting obligation. The plaintiff has failed to demonstrate, and the arbitrator clearly did not believe, that a one month unpaid suspension is not a severe enough sanction to encourage prompt reporting. Rather, the arbitrator reasonably concluded that a sanction short of termination may accomplish the twin objectives of punishing the failure to promptly report while still incentivizing employees who have not immediately reported their suspicions to do so without further delay.

[16] See footnote 11 of this opinion.