******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

BURR ROAD OPERATING COMPANY II, LLC *v.* NEW
ENGLAND HEALTH CARE EMPLOYEES UNION,
DISTRICT 1199
(AC 33954)

DiPentima, C. J., and Beach and Bear, Js.

*Argued October 14, 2015—officially released January 26, 2016*

(Appeal from Superior Court, judicial district of
Hartford, Hon. Robert F. Stengel, judge trial referee.)

*Jeffrey R. Babbin*, with whom, on the brief, was
*Andrea C. Kramer*, for the appellant (plaintiff).

*Michael E. Passero*, for the appellee (defendant).

*Opinion*

BEAR, J. This appeal comes to us on remand from our Supreme Court. In *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, 142 Conn. App. 213, 214–15, 70 A.3d 42 (2013), rev'd, 316 Conn. 618, 621, 114 A.3d 144 (2015), this court held that an arbitration award "reinstating the grievant, Leoni Spence, who is an employee of the plaintiff, Burr Road Operating Company II, LLC . . . and a member of the defendant, New England Health Care Employees Union, District 1199," violated public policy, and we reversed the trial court's determination to the contrary. Our Supreme Court reversed our decision, holding that the award did not violate public policy. *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, 316 Conn. 618, 621, 114 A.3d 144 (2015) (*Burr Road*). Consequently, the court remanded the case to us with the direction to consider the plaintiff's remaining claim.[1] Id., 651. The sole remaining issue for our consideration is whether the trial court improperly denied the plaintiff's application to vacate the award pursuant to General Statutes § 52-418 (a) (4)[2] because the arbitrator exceeded his authority. We conclude it did not and accordingly affirm the judgment of the trial court.

The facts relevant to our resolution of the plaintiff's remaining claim, as set forth by our Supreme Court, are as follows. "The plaintiff operates a 120 bed skilled nursing facility known as the Westport Health Care Center (Westport). . . . The grievant was employed there as a certified nursing assistant from 2002 until the termination of her employment in 2010, and is represented by the defendant. . . .

"Between 2005 and 2009, the grievant was the subject of three disciplinary actions that have remained part of her personnel file. . . . In 2005, she received a suspension and final warning after she improperly restrained a resident by using a bed sheet to tie him into his wheelchair. . . . In April, 2009, she received a written warning for speaking to a resident in an inappropriately rude, loud, and scolding manner, and for being insubordinate and disrespectful to her shift supervisor, registered nurse Gay Muizulles. . . . Finally, in August, 2009, the grievant received a [second] and [f]inal written warning for addressing a resident disrespectfully and touching that resident without first explaining the procedure involved." (Citations omitted; footnote omitted; internal quotation marks omitted.) Id., 621–22.

The particular incident giving rise to the plaintiff's termination of the grievant's employment began on Saturday, March 20, 2010. Id., 622. During a night shift beginning on the evening of March 20 and ending on the morning of March 21 in Westport's Riverside unit

(Riverside), the grievant overheard a conversation between two coworkers, Dezra Leonard and Laurel Johnson. Id. "On the basis of the conversation she overheard, the grievant concluded that Muizulles had been involved in an incident [in Westport's Woodside unit (Woodside)] in which a resident had been crying. . . . Although the grievant could not be certain, she also believed that the incident might have involved abuse. . . . Before her shift ended, the grievant went to Woodside to . . . investigate. . . . The residents were all asleep, however, and no one was crying." (Citations omitted.) Id., 622–23. The grievant failed to report her suspicions immediately, because, as found by the arbitrator, "[she] didn't know for sure that there had been abuse . . . ." (Internal quotation marks omitted.) Id., 623. Further, "[t]here . . . is no indication that she pursued the matter the following night shift, from Sunday, March 21, to Monday, March 22, when she again worked on Riverside with Muizulles." Id.

"The first shift that the grievant worked on Woodside after the suspected incident was the next night, from Monday, March 22, to Tuesday, March 23. . . . During that shift, she had occasion to speak with a resident of Woodside, who told the grievant that, on the previous Saturday night, Muizulles had been somewhat rough while helping her get her legs up onto her bed, had spoken gruffly, and had turned down the television without asking permission. . . . The resident's roommate confirmed that these events had upset the resident, who had cried for some time afterward. . . .

"The grievant realized that this was likely the incident she had overheard Johnson and Leonard discussing during the Saturday night shift. . . . The grievant comforted the resident, explained to her that she should not have been subjected to such treatment, and informed her that she should feel comfortable reporting it. . . . The grievant suggested that she could arrange for someone to come and speak to the resident about what had happened to her, and the resident agreed." (Citations omitted.) Id., 623. Subsequently, "[a]fter her shift ended on Tuesday morning, the grievant went home and tried to call a social worker at Westport. . . . The social worker was not available, however, so the grievant left her three lengthy voice mail messages reporting what the resident had told her and urging the social worker to talk to the resident." (Citation omitted.) Id., 624.

After "a thorough investigation of Muizulles' treatment of the resident," the plaintiff determined that, although insensitive, her treatment did not rise to the level of abuse or neglect and gave her a five day suspension and a final warning. Id., 624. During this investigation, "the plaintiff also concluded that three staff members . . . [one of whom was] the grievant . . . had failed to fulfill their obligations promptly to report

Muizulles' possible abuse." Id. Johnson received a suspension and a final warning, and the other staff member received a suspension. Id. "There is no indication in the record that Leonard was ever disciplined for her failure to report what Johnson had told her." Id.

"By contrast, the plaintiff terminated the grievant's employment on the ground that she had failed to make a timely report of an allegation of resident abuse. . . . It subjected her to more serious discipline than Muizulles, Johnson, and the [other staff member] because, unlike those employees, the grievant already had a final warning in her employee file. Prior to terminating the grievant's employment, the plaintiff never informed her that she was under investigation, nor afforded her any opportunity to tell her side of the story or to explain or to clarify why she did not immediately report her suspicions after her shift had ended on Sunday morning. . . . 'This most rudimentary due process,' the arbitrator remarked, 'was not afforded to the grievant.'

"The grievant grieved her termination, and the defendant took the termination to arbitration pursuant to the collective bargaining agreement between the parties. The parties asked the arbitrator to determine: (1) whether the grievant had been terminated for just cause; and (2) if not, what the remedy should be." (Citations omitted.) Id., 624–25.

The arbitrator determined that "the grievant improperly had delayed reporting an incident of suspected resident abuse" and, thus, "was guilty of the offense of failing to timely report to a nursing supervisor (or higher authority) the information that had come into her possession . . . ." (Internal quotation marks omitted.) Id., 625–26. In evaluating whether just cause existed to terminate the grievant's employment for her failure to timely report, the arbitrator considered a health care provider's statutory duty to report suspected abuse[3] and the potential harms that could arise if an employee delays reporting, ultimately "credit[ing] the plaintiff's argument that a delay in reporting is almost as bad as not reporting at all." (Internal quotation marks omitted.) Id., 626. "The arbitrator also concluded, however, that it was 'an important mitigating fact that the grievant was the one who actually came forward, although belatedly, and made [the plaintiff] aware of the problem. If the grievant had not come forward on March 23, it is quite likely that [the plaintiff] never would have learned of the insensitive treatment given by Muizulles, nor of the failure to report by multiple staff members. It is important to recognize that contribution which the grievant made, then, albeit belatedly, to help assure the well-being of the residents . . . .' For that reason, the arbitrator recognized that 'the grievant's misconduct arguably was much less egregious than the misconduct of the others involved,' who 'apparently had no intention of making any report.'

"Ultimately, the arbitrator found as follows: 'The grievant did fail to make a timely report of what she had learned on March 20. She knew the rule that she had to report, and to do so without delay. She failed to fulfill that responsibility in a timely manner. And, she had a poor disciplinary record, so that placed her in a worse position than the other staff members involved . . . . On the other hand, there is the significant mitigating factor that it was the grievant, not the others, who did come forward and report to [the plaintiff], although belatedly; and it was her reporting [that] allowed [the plaintiff] to take corrective actions.' . . . Accordingly, the arbitrator concluded that the plaintiff lacked just cause to terminate the grievant's employment. Instead, the arbitrator interpreted the parties' collective bargaining agreement to mean that 'severe disciplinary action just short of termination was warranted.' The arbitrator therefore determined that the plaintiff had just cause to suspend the grievant without pay for one month and to issue her a final warning and, accordingly, he ordered the grievant reinstated." (Footnotes omitted.) Id., 626–27.

The plaintiff filed an application to vacate the arbitration award on two grounds—specifically, that the award violated public policy and that "the arbitrator exceeded his powers under the collective bargaining agreement and refused to hear pertinent evidence"—and the defendant filed an application to confirm the award. Id., 627–28. The trial court, *Hon. Robert F. Stengel*, judge trial referee, rejected both of the plaintiff's grounds in support of its application to vacate. In addressing whether the arbitrator exceeded his authority, the court determined that the award answered the questions specifically before him. Considering the plaintiff's arguments that the failure of the arbitrator to give credit to the final warnings and his consideration of the mitigating factor "create[d] a new category of disciplinary infraction that doesn't exist in the collective bargaining agreement," the court observed that "there was no express language which restricted the issues to be considered by the arbitrator in determining whether the grievant was terminated for just cause." Noting that "the arbitrator [had] considered but rejected the grievant's voluntary admission of her failure to report abuse and the argument that the final warning in the grievant's file created just cause for termination," had found that although she had a poor disciplinary history, her misconduct was less egregious than that of her coworkers, and had determined that "she reported the abuser when others did not was a mitigating factor," the court held that it was bound by these legal and factual determinations by the arbitrator. "Accordingly, the trial court rendered judgment denying the plaintiff's application to vacate and granting the defendant's application to confirm the award." *Burr Road*, supra, 316 Conn. 628.

"The propriety of arbitration awards often turns on the unique standard of review and legal principles applied to decisions rendered in this forum. Judicial review of arbitral decisions is narrowly confined. . . . Because we favor arbitration as a means of settling private disputes, we undertake judicial review of arbitration awards in a manner designed to minimize interference with an efficient and economical system of alternative dispute resolution. . . . When the parties agree to arbitration and establish the authority of the arbitrator through the terms of their submission, the extent of our judicial review of the award is delineated by the scope of the parties' agreement. . . . Parties to an arbitration may make a restricted or an unrestricted submission. . . .

"Where the submission does not otherwise state, the arbitrators are empowered to decide factual and legal questions and an award cannot be vacated on the grounds that . . . the interpretation of the agreement by the arbitrators was erroneous. Courts will not review the evidence nor, where the submission is unrestricted, will they review the arbitrators' decision of the legal questions involved. . . . In other words, [u]nder an unrestricted submission, the arbitrators' decision is considered final and binding; thus the courts will not review the evidence considered by the arbitrators nor will they review the award for errors of law or fact. . . . A submission is deemed restricted only if the agreement contains express language restricting the breadth of issues, reserving explicit rights, or conditioning the award on court review." (Citations omitted; internal quotation marks omitted.) *AFSCME, Council 4, Local 2663* v. *Dept. of Children & Families*, 317 Conn. 238, 249–50, 117 A.3d 470 (2015).

"The significance, therefore, of a determination that an arbitration submission was unrestricted or restricted is not to determine what the arbitrators are obligated to do, but to determine the scope of judicial review of what they have done. Put another way, the submission tells the arbitrators what they are obligated to decide. The determination by a court of whether the submission was restricted or unrestricted tells the court what its scope of review is regarding the arbitrators' decision." (Internal quotation marks omitted.) *Industrial Risk Insurers* v. *Hartford Steam Boiler Inspection & Ins. Co.*, 258 Conn. 101, 110, 779 A.2d 737 (2001).

Here, the parties agree that the submission was unrestricted, and our own review of the language of the submission and agreement finds no express language placing restrictions on the arbitrator's authority. Nevertheless, the plaintiff asserts that, despite this unrestricted submission, the award must be vacated pursuant to § 52-418 (a) (4) because the arbitrator exceeded his authority.

"When addressing a claim that the arbitrators have exceeded their authority and violated § 52-418 (a) (4), the court's inquiry generally is limited to a determination as to whether the parties have vested the arbitrators with the authority to decide the issue presented or to award the relief conferred. . . . Thus, the court's review of [a] claim that the arbitrators exceeded their authority in rendering their award is limited to a comparison between the submission and the award to see whether, in accordance with the powers conferred upon the arbitrators, their award conforms to the submission. . . . During this limited inquiry, the court is required to provide [e]very reasonable presumption and intendment . . . in favor of the award and of the arbitrators' acts and proceedings. Hence, the burden rests on the party attacking the award to produce evidence sufficient to invalidate it or avoid it. . . .

"Furthermore, [a]rbitration awards . . . are not to be invalidated merely because they rest on an allegedly erroneous interpretation or application of the relevant collective bargaining agreement. . . . Rather, in determining whether the arbitration award draws its essence from the collective bargaining agreement, the reviewing court is limited to considering whether the collective bargaining agreement, rather than some outside source, is the foundation on which the arbitral decision rests. . . . If that criterion is satisfied . . . then [the court] cannot conclude that the arbitrator exceeded his authority or imperfectly executed his duty. . . . Ultimately, [n]either a misapplication of principles of contractual interpretation nor an erroneous interpretation of the agreement in question constitutes grounds for vacatur. . . . It is not [the court's] role to determine whether the arbitrator's interpretation of the collective bargaining agreement was correct. It is enough to uphold the judgment of the court, denying the . . . application to vacate the award, that such interpretation was a good faith effort to interpret the terms of the collective bargaining agreement. . . .

"Indeed, [b]y including an arbitration clause in their contract, the parties bargain for a decision maker that is not constrained by formalistic rules governing courtroom proceedings and dictating judicial results. . . . Put simply, the parties bargain for the arbitrator's independent judgment and sense of justice . . . . Thus, it is only [w]hen the arbitrator's words manifest an infidelity to [the obligation of rendering an award that draws its essence from the collective bargaining agreement], [that] courts have no choice but to refuse enforcement of the award. . . . . Finally, even if we disagree with the arbitrators' reasoning and the bases for their award, the award nevertheless controls unless the arbitrators' memorandum patently shows an infidelity to [their] obligation . . . ." (Citations omitted; internal quotation marks omitted.) *AFSCME, Council 4, Local 1303-*

*325* v. *Westbrook*, 309 Conn. 767, 779–81, 75 A.3d 1 (2013).

The plaintiff's contentions that the arbitrator exceeded his authority can be summarized into three general arguments, the first two of which concern the arbitrator's consideration of the final warnings that the grievant previously had been given. First, the plaintiff argues that the arbitrator's failure to give dispositive weight to these final warnings shows that he ignored the language of the collective bargaining agreement concerning the special nature of the "patient care related disciplinary infractions." Second, the plaintiff argues that, by determining that the grievant's eventual report of her suspicions was a mitigating factor to her disciplinary record, the arbitrator implicitly added a term in violation of the provisions of the collective bargaining agreement prohibiting any such change by the arbitrator. This second argument overlaps substantially with the plaintiff's third argument, specifically, that the arbitrator, by refusing to consider the grievant's statements in her voice messages because the plaintiff failed to investigate these statements, impermissibly added a procedural requirement that the collective bargaining agreement does not mandate.

We first note that, despite certain language to the contrary, none of the plaintiff's arguments truly suggests that the arbitrator's award failed to answer the questions submitted or answered questions beyond those submitted.[4] Rather, each of its arguments concern the manner in which the arbitrator arrived at his conclusions. We, therefore, review these claims to determine only whether they show a patent infidelity by the arbitrator to his obligation to interpret and apply the collective bargaining agreement. We are not convinced that the award represents anything less than a good faith effort by the arbitrator to construe and apply the relevant terms of the collective bargaining agreement in the context of the questions submitted to him.

"[A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement." (Internal quotation marks omitted.) *Hudson Wire Co.* v. *Winsted Brass Workers Union*, 150 Conn. 546, 553, 191 A.2d 557 (1963), quoting *United Steelworkers* v. *Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S. Ct. 1358, 4 L. Ed. 2d 1424 (1960). "If, for example, there was evidence that revealed that [the arbitrator] had reached his decision by consulting a ouija board, [it would] not suffice that the award conformed to the submission. . . . It must be emphasized, however, that merely claiming inconsistency between the agreement and the award will not trigger judicial

examination of the merits of the arbitration award. Rather, in the face of such a claimed inconsistency, this court will review the award only to determine whether it draws its essence from the collective bargaining agreement. . . . We will not, however, employ a broader standard of review simply as an alternative means for determining whether the arbitrator correctly decided the issues that were submitted to arbitration." (Citation omitted; internal quotation marks omitted.) *Teamsters Local Union No. 677* v. *Board of Education*, 122 Conn. App. 617, 624–25, 998 A.2d 1239 (2010).

Finally, we previously have stated that "[m]erely because an arbitral decision is not based on the express terms of a collective bargaining agreement does not mean that it is not properly derived from the agreement. An arbitrator is entitled to take cognizance of contract principles and draw on them for guidance in construing an agreement." (Internal quotation marks omitted.) *Local 391, Council 4, AFSCME* v. *Dept. of Correction*, 76 Conn. App. 15, 19, 817 A.2d 1279 (2003).

Having set forth the principles governing our analysis, we turn to the portions of the collective bargaining agreement in effect at all times relevant to this dispute.[5] Article 5 of the agreement defines generally the management rights retained by the plaintiff. It provides in relevant part that, "[e]xcept as otherwise specifically provided herein, the management and operation of the nursing [c]enter, the control of the premises and the direction of the work force are vested exclusively with [the plaintiff] and the right to manage includes, but is not limited to the right to . . . discipline, enforce work rules, suspend, [or] *discharge for just cause* . . . ." (Emphasis added.)

Article 25 of the collective bargaining agreement defines both the plaintiff's general right to discipline and discharge, certain specific restrictions on that right, and the applicable procedures to be followed if the plaintiff wishes to exercise that right. Section A of article 25 restates the plaintiff's "right to discharge, suspend or discipline an Employee for just cause." It provides no further definition of just cause and does not list either specific instances of behavior sufficient to establish just cause or any actions that will result in an employee's automatic termination. Section B requires the plaintiff to mail notice to the defendant of any suspension or discharge; if the defendant subsequently contests the discipline, then the dispute will be resolved pursuant to the grievance and arbitration provisions of the collective bargaining agreement. Section F requires the plaintiff to remove any record of disciplinary action within twelve months of its issuance if no new record of discipline is entered, but exempts "disciplinary actions regarding patient abuse" from these requirements.

Finally, article 29 provides the general structure of

any arbitration taken pursuant to the collective bargaining agreement if a grievance is not resolved pursuant to the procedures outlined in article 28. Section B of article 29 provides in relevant part: "It is the function of the Arbitrator to make and issue decisions only regarding matters expressly submitted to him or her. The Arbitrator shall not have jurisdiction to add to, modify, vary, change, or remove any terms of this Agreement." Section C provides in relevant part: "In the event of an arbitration of the discharge of an Employee, the [A]rbitrator may uphold the discharge or reinstate the discharge, with or without back pay, in whole or in part, as the circumstances in his or her opinion warrant."

The plaintiff's first argument concerning the arbitrator's failure to give dispositive weight to the two "final warnings" that the grievant had been given is without merit. As our Supreme Court noted, "[a]lthough the arbitrator suggests that these notations [concerning final warnings] had important significance under the collective bargaining agreement, that significance is not explained in the arbitration award." *Burr Road*, supra, 316 Conn. 622 n.2. Further, there is also no language in the collective bargaining agreement defining the role of a "final warning" or, as our Supreme Court pointed out, strictly requiring discharge if an infraction occurs while there is a "final warning" on file. See id., 651. Consequently, despite the plaintiff's contentions that the arbitrator failed to give sufficient weight to the fact that incidents related to patient care are never expunged from an employee's personnel files, the determination of the role and weight to be accorded to these final warnings under the collective bargaining agreement was left solely within the province of the arbitrator.[6] See *AFSCME, Council 4, Local 2663* v. *Dept. of Children & Families*, supra, 317 Conn. 255–56 (finding that arbitrator did not exceed authority in determining off duty conduct was just cause to terminate employee when, inter alia, "collective bargaining agreement did not . . . limit just cause for dismissal to conduct on the job").

The plaintiff's second and third arguments concerning the allegedly impermissible addition of terms by the arbitrator to the collective bargaining agreement are also without merit. We begin by noting that the term "just cause," despite being used several times in the collective bargaining agreement,[7] is nowhere therein defined or limited. Therefore, to give effect to this provision, the arbitrator was required to construe the meaning of "just cause" in the collective bargaining agreement.

As we previously have noted, in interpreting this agreement, the arbitrator is permitted to "look for guidance from many sources"; (internal quotation marks omitted) *Hudson Wire Co.* v. *Winsted Brass Workers*

*Union*, supra, 150 Conn. 553; and "is entitled to take cognizance of contract principles and draw on them for guidance in construing an agreement." (Internal quotation marks omitted.) *Local 391, Council 4, AFSCME* v. *Dept. of Correction*, supra, 76 Conn. App. 19. "In interpreting and construing contracts . . . [l]anguage must be given its ordinary meaning unless a technical or special meaning is clearly intended." (Internal quotation marks omitted.) *Perkins* v. *Eagle Lock Co.*, 118 Conn. 658, 663, 174 A. 77 (1934). "Technical words in a contract will be interpreted as they are usually understood by persons in the profession or business to which they relate, and are taken in a technical sense, unless the context of the instrument, the applicable usage, or the surrounding circumstances clearly indicates that a different meaning was intended. Technical words, including legal terms, therefore ordinarily will be given a technical meaning." (Footnotes omitted.) 17A C.J.S. 301, Contracts § 408 (2011).

The term "just cause," despite its relative ubiquity in collective bargaining agreements, does not lend itself to a single universal characterization or test. See M. Trotta, Arbitration of Labor-Management Disputes (1974), pp. 231, 236 (almost all collective bargaining agreements place limitations on management's right to discharge through language such as, inter alia, "for just cause," but "no standards exist for defining 'just cause' "). A common understanding of what just cause requires in this context involves not only a determination of whether the employee committed the infraction in question, but whether "the proven conduct constitutes sufficient grounds to support the discipline or discharge imposed." R. Abrams, Inside Arbitration: How an Arbitrator Decides Labor and Employment Cases (2013), § 10.IV.3, pp. 208–209; accord The Common Law of the Workplace: The Views of Arbitrators (T. St. Antoine ed., 1998) § 6.7, comment (a), p. 172 ("[t]he concept of 'just cause' implies not only that the employer have a 'cause' for disciplining the employee, but also that the discipline be 'just' in relation to the asserted cause"). Pursuant to this understanding, several treatises on arbitration have noted that the concept of just cause to impose a particular type of discipline may involve both an evaluation of any mitigating circumstances[8] and an implicit guarantee of due process protections.[9]

As recognized by our Supreme Court, parties to a collective bargaining agreement may impose limitations as to what an arbitrator may consider in determining whether just cause exists. *State* v. *AFSCME, Council 4, Local 391*, 309 Conn. 519, 533 n.10, 69 A.3d 927 (2013).[10] Absent such restrictions, however, it has refused to vacate an award where the arbitrator had determined that the party engaged in the alleged conduct, but found the punishment unjust. See *Niles-Bement-Pond Co.* v. *Amalgamated Local 405*, 140 Conn.

32, 38, 97 A.2d 898 (1953) ("Even though [the employee] had been insubordinate, it did not necessarily follow that he should have been discharged. There was still the question whether his insubordination was of such a nature as to constitute 'just cause' for his discharge."); cf. *Burr Road*, supra, 316 Conn. 638 (courts must "defer . . . to the arbitrator's ultimate determination whether termination was a just or appropriate punishment for the conduct at issue" in evaluating egregiousness factor of public policy review).[11]

Further, this court has refused to vacate an arbitration award under similar circumstances in *Board of Education* v. *Local 818*, 5 Conn. App. 636, 502 A.2d 426 (1985). There, the award, made pursuant to a submission virtually identical to the one before the arbitrator in the present case, interpreted the applicable portions of the collective bargaining agreement as requiring "just cause" to discipline despite that specific language not being present in the collective bargaining agreement. See id., 638–39. In affirming the trial court's denial of the motion to vacate, we stated: "[A] comparison of the contract and the award does not support the board's claim that the arbitrators failed to interpret the agreement as written. The award ordered reinstatement of the employee because he had not been terminated for 'just cause.' The contract required that disciplinary actions be applied in a 'fair manner' and consistent with the nature of the infraction for which the disciplinary action was taken. A requirement of just cause for termination and a requirement of fairness in discipline are not so inconsistent as to give rise to an inference that the arbitrators did not reach their decision by interpreting the parties' agreement." Id., 641.

Finally, we note that the courts of this state repeatedly have upheld awards as drawing their essence from the collective bargaining agreement, despite the presence of provisions that limit an arbitrator's ability to add, delete, or modify the express terms of the agreement, when the arbitrator's analysis shows that the award found its genesis in the provisions of the agreement rather than some outside source. See, e.g., *Board of Education* v. *Bridgeport Education Assn.*, 173 Conn. 287, 292–94 and nn. 2 and 3, 377 A.2d 323 (1977); *New Haven* v. *AFSCME, Council 15, Local 530*, 106 Conn. App. 691, 699–700, 943 A.2d 494 (2008); *Board of Education* v. *Civil Service Employees Affiliates, Local 760*, 88 Conn. App. 559, 560–61, 570–71, 870 A.2d 473 (2005).

In support of its latter two arguments, the plaintiff places great emphasis on *Danbury* v. *Teamsters Local 677*, Superior Court, judicial district of Waterbury, Docket No. CV-98-0144861-S (May 7, 1998) (22 Conn. L. Rptr. 249), and certain cases cited therein, to demonstrate that the arbitrator impermissibly altered the collective bargaining agreement by considering any

mitigating circumstances or refusing to consider certain alleged admissions by the grievant because they were not independently investigated. Neither the analysis in *Danbury*[12] nor the appellate authority on which it relies, however, compels the result that the plaintiff seeks. Even assuming that the court's decision in *Danbury* was correct, the situation here is distinguishable in that the arbitrator was both within his authority under the submission[13] and arguably interpreting a term in the collective bargaining agreement rather than adding a wholly new term. See id., 251 (vacating award reinstating employee because no express requirement of warning prior to discharge for insubordination within agreement and arbitrators relied on general arbitral practice rather than pointing to any specific terms of agreement). Further, both of the cases discussed in *Danbury* are also distinguishable for similar reasons.[14]

Here, the parties sought a determination whether the grievant had been terminated for just cause, and if not, what the remedy should be. To answer this question, the arbitrator was required to determine what just cause to terminate meant within the context of the parties' collective bargaining agreement. Therefore, by construing the term just cause in a manner consistent with its general usage in the field of labor agreements, his award patently drew its essence from the collective bargaining agreement. See *Comprehensive Orthopaedics & Musculoskeletal Care, LLC* v. *Axtmayer*, 293 Conn. 748, 755, 980 A.2d 297 (2009) ("as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of authority, the award must be enforced" [internal quotation marks omitted]).

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Following this order by the Supreme Court, this court, on June 11, 2015, ordered, sua sponte, that the parties be allowed to file supplemental briefs by August 3, 2015. Pursuant to this order, the defendant filed a supplemental brief on August 3, 2015. Additionally, on September 9, 2015, we granted the motion to substitute Wiggin & Dana, LLP, for the plaintiff's original counsel.

[2] General Statutes § 52-418 (a) provides in relevant part: "Upon the application of any party to an arbitration, the superior court for the judicial district in which one of the parties resides . . . shall make an order vacating the award . . . (4) if the arbitrators have exceeded their powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made."

[3] General Statutes § 17b-451 (a) requires certain parties involved in the care of elderly persons to report any reasonably suspected abuse. This requirement applies to "any registered nurse, any nursing home administrator, nurse's aide or . . . staff person employed by a nursing home facility . . . ." (Internal quotation marks omitted.) *Burr Road*, supra, 316 Conn. 642; see also General Statutes § 17b-451 (a).

[4] Indeed, as the record demonstrates, the arbitrator answered the questions submitted. The submission in its entirety reads: "Was [the grievant] terminated for just cause? If not, what shall the remedy be?" In his award, the arbitrator determined that, although the plaintiff lacked just cause to discharge the grievant, it had just cause to suspend her without pay for a month and issue her a final warning. As a remedy, he ordered that the defendant reinstate the grievant and compensate her for all back pay and benefits that she lost except for the one month for which it had just cause to suspend her. Because the award answers precisely the two questions that were placed before the arbitrator, it manifestly conforms to the submis-

sion. See, e.g., *Brantley* v. *New Haven*, 100 Conn. App. 853, 865–67, 920 A.2d 331 (2007) (upholding award made pursuant to similar submission that found employer lacked just cause to terminate employee, but had sufficient cause to impose eight month suspension); see also *Stratford* v. *Local 134, IFPTE*, 201 Conn. 577, 584, 519 A.2d 1 (1986) (award finding that plaintiff city had violated collective bargaining agreement and ordering remedial payments "was dispositive of the dispute the parties had submitted to the [arbitrators]").

[5] Article 39, § A, of the collective bargaining agreement provides: "This Agreement shall be in full force and effect for the period commencing on December 31, 2004 and ending on March 16, 2011."

[6] In fact, the arbitrator both recognized and weighed the grievant's disciplinary history in making his ultimate determination that just cause to discharge did not exist, but just cause to suspend did.

[7] Article 5 of the collective bargaining agreement reserves to the plaintiff the sole right, "[e]xcept as otherwise specifically provided [in the collective bargaining agreement]," to "discipline . . . suspend, [or] discharge for just cause . . . ." Article 9, § B.3.b, provides that an employee loses his or her seniority if he or she is "discharge[d] for just cause . . . ." Finally, article 25, § A, reiterates that the plaintiff has "the right to discharge, suspend or discipline an Employee for just cause."

[8] "The just cause principle entitles employees to . . . [an] individualized consideration of specific mitigating and aggravating factors." The Common Law of the Workplace: The Views of Arbitrators, supra, § 6.2, p. 159. "Mitigating factors include an employee's . . . good faith . . . [and] the absence of serious harm from the employee's conduct . . . ." Id., comment (b), p. 160; see also R. Abrams, supra, § 10.V.6, p. 217 (mitigating circumstances are relevant to employer's determination that employee can no longer serve and, therefore, to arbitrator's subsequent evaluation whether just cause to discharge exists); F. Elkouri & E. Elkouri, How Arbitration Works (A. Ruben ed., 6th Ed. 2003) §15.3.F.i, p. 966 ("[i]n [less serious] cases, discipline may be considered to be excessive if it is disproportionate to the degree of the offense, if it is out of step with principles of progressive discipline, if it is punitive rather than corrective, or if mitigating circumstances were ignored" [internal quotation marks omitted]); M. Trotta, supra, pp. 236–37 (listing several illustrative factors to be considered, including nature and number of past offenses by grievant, how other employees were disciplined for similar offenses, grievant's own pattern of conduct, and whether "the penalty [is] reasonable and appropriate to the offense").

[9] "The just cause principle entitles employees to due process . . . ." The Common Law of the Workplace: The Views of Arbitrators, supra, § 6.2, p. 159. Although "[m]ost arbitrators require that an employer's decision to discipline or discharge an employee must be based on a meaningful, more-than-perfunctory factual investigation"; id., § 6.14, p. 192; the way in which this requirement is implemented varies: "This requirement is sometimes described as part of an employee's procedural due process protections, *and sometimes as an element of the employer's necessary showing of just cause*." (Emphasis added.) Id., comment (a); see also R. Abrams, supra, § 10.IV.6, pp. 211 ("the concept of 'due process' is inherent in the just cause provision" because it aids accuracy of result); F. Elkouri & E. Elkouri, How Arbitration Works (A. Ruben ed., 6th Ed. 2003) §15.3.F.ii, p. 967 ("To satisfy industrial due process, an employee must be given an adequate opportunity to present his or her side of the case before being discharged by the employer. If the employee has not been given such an opportunity, arbitrators will often refuse to sustain the discharge or discipline assessed against the employee. The primary reason arbitrators have included certain basic due process rights within the concept of just cause is to help the parties prevent the imposition of discipline where there is little or no evidence on which to base a just cause discharge. Thus, consideration of industrial due process as a component of just cause is an integral part of the just cause analysis for many arbitrators." [Footnote omitted.])

[10] "[A] collective bargaining agreement may reserve to the employer the unreviewable discretion . . . to discharge an employee once a violation of [an employment rule] is found . . . in which case the arbitrator would be required to defer to the employer's choice of discipline after finding that the employee engaged in the claimed misconduct. . . . If an employer specifies in the collective bargaining agreement that it reserves the nonreviewable power to choose the form of discipline for such misconduct, and the submission to the arbitrator specifies that the arbitrator is authorized to determine only whether the alleged misconduct occurred, not whether the punishment was appropriate, an arbitration award imposing a lesser form of discipline . . . would be subject to vacatur as exceeding the arbitrator's powers."

(Citations omitted; internal quotation marks omitted.) *State* v. *AFSCME, Council 4, Local 391*, supra, 309 Conn. 533 n.10.

[11] A number of courts in other jurisdictions have upheld awards under similar circumstances and against similar arguments as those raised by the plaintiff in this case. See, e.g., *PSC Custom, LP* v. *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Industrial & Service Workers International Union, Local No. 11-770*, 756 F.3d 627, 629–32 (8th Cir. 2014) (award limited determination of issues on due process grounds and found that just cause did not exist to discharge despite provisions in collective bargaining agreement reserving management rights generally and forbidding modification or alteration of terms of agreement); *General Truck Drivers, Chauffers, Warehousemen & Helpers, Local Union 957* v. *Dayton Newspapers, Inc.*, 190 F.3d 434, 435–36, 438–39 (6th Cir. 1999) (reversing vacation of award where collective bargaining agreement had similar terms as those presently before this court and rejecting argument that award impermissibly created additional terms), cert. denied, 528 U.S. 1137, 120 S. Ct. 980, 145 L. Ed. 2d 931 (2000); *Federated Dept. Stores* v. *United Food & Commercial Workers Union, Local 1442*, 901 F.2d 1494, 1496–98 (9th Cir. 1990) (upholding award against arguments that it did not draw essence from collective bargaining agreement and that arbitrator exceeded powers because "whether there was just cause to discharge [the grievant] was explicitly before the arbitrator and he justifiably viewed due process as an element of just cause"); *Office of Attorney General* v. *Council 13, AFSCME, AFL-CIO*, 577 Pa. 257, 268–71, 844 A.2d 1217 (2004) (upholding award that considered mitigating factors to find "just cause" did not exist because term was not defined by collective bargaining agreement and refusing "[t]o reduce the undefined term just cause to the equivalent of a mere factual finding of misconduct").

[12] As we previously have recognized, although they can be used as persuasive authority, decisions of the Superior Court are not binding on this court. See *Green Falls Associates, LLC* v. *Zoning Board of Appeals*, 138 Conn. App. 481, 490 n.7, 53 A.3d 273 (2012).

[13] The defendant argues that *Danbury* may be distinguished because the submission in that case required the arbitrators to determine whether the city "violate[d] the collective bargaining agreement by terminating the employment of the [grievant]"; *Danbury* v. *Teamsters Local 677*, supra, 22 Conn. L. Rptr. 250; whereas the submission in the present case asked the arbitrator to determine only whether "just cause" existed to discharge the grievant. Thus, the arbitrator, the defendant contends, "was *directed* by the parties to apply the arbitral standard of just cause," seemingly unmoored from the language of the collective bargaining agreement. (Emphasis added.)

Our statements in *North Branford* v. *Pond*, 134 Conn. App. 89, 94 n.2, 38 A.2d 198 (2012), addressing whether the modifier "consistent with the contract" rendered an otherwise unrestricted submission restricted, demonstrate that the defendant's arguments are without merit: "When a submission to an arbitration panel requires the panel to determine if a standard set forth in the parties' agreement has been met, it is axiomatic that the arbitrators must construe and apply that provision in accordance with the entire agreement, as they interpret it. Just as their arbitral authority arises only from the agreement, so too must the limits of that authority derive their essence from the agreement. Accordingly, *words in a submission confirming that the matter at issue must be determined in a manner consistent with the contract neither add to nor subtract from arbitral authority . . . .*" (Emphasis added.)

[14] See *Board of Education* v. *AFSCME*, 195 Conn. 266, 271–73, 487 A.2d 553 (1985) (award in excess of authority not only because manner of providing termination notices not defined in collective bargaining agreement, but also because award relied solely on stipulated arbitration award from separate grievance, agreement prevented arbitrators from issuing award that amended agreement or "*determine[d] that the parties by implication have supplemented their agreement unless that issue is expressly submitted*," and issue submitted solely concerned whether employer violated agreement in terminating employee [emphasis added]); *International Assn. of Fire Fighters, Local 1339, AFL-CIO* v. *Waterbury*, 35 Conn. App. 775, 780, 647 A.2d 361 (1994) (where submission required arbitrators to determine if city violated particular provision of collective bargaining agreement, and "[i]nstead of answering the question submitted, the arbitrators stated that they were denying the grievance *because* of 'extenuating circumstances' and *because* they were 'without jurisdictional authority to make the pension adjustments' . . . [t]he arbitrators . . . exceeded their powers . . .

because their award included matters outside the submission, namely the arbitrators' noncontractual reasons for denying the grievance" [emphasis in original]).

---